**STERLING DRUG INC., Plaintiff,**

v.

**BAYER AG, Bayer USA Inc., Mobay Corporation and Miles Inc., Defendants.**

**No. 90 Civ. 3460 (RJW).**

United States District Court, S.D. New York.

May 15, 1992.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Lewis A. Kaplan, Daniel J. Leffell, Beth R. Lobel, David L. Goldberg, of counsel), Von Maltitz, Derenberg, Kunin, Janssen & Giordano, New York City, for plaintiff.

Cravath, Swaine & Moore, New York City (Francis P. Barron, Robert H. Baron, of counsel), Connolloy, Bove, Lodge & Hutz, Wilmington, Del. (John D. Fairchild, of counsel), Willian, Brinks, Olds, Hofer, Gilson & Lione, Chicago, Ill. (Jerome Gilson, of counsel), for defendants.

ROBERT J. WARD, District Judge.

In this action, plaintiff Sterling Drug Inc. ("Sterling") alleges that defendant Bayer AG ("AG") and its subsidiaries have made use of the trademark and trade name "Bayer" and the name "Bayer USA Inc." in a manner that violates Sterling's rights under two contracts between Sterling and AG, the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act"), the law of unfair competition and the New York Anti–Dilution Statute, N.Y.Gen.Bus.Law § 368–d. Sterling seeks a permanent injunction enjoining defendants' conduct, as well as monetary damages. By stipulation of the parties, the question of plaintiff's entitlement to injunctive relief was tried by the Court without a jury in a 12–day trial that began on July 1, 1991, with any monetary damages to be determined in a separate trial, if necessary.

The record before the Court consists of the evidence adduced by the parties during the trial as well as evidence submitted by the parties following the trial relating to the respective corporate reorganizations of Sterling and defendant Bayer USA Inc. ("Bayer USA"). Based on the entire record, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## BACKGROUND

Sterling is incorporated under the laws of the State of Delaware and has its principal place of business in New York City. Sterling manufactures and sells prescrip-

tion drugs, over-the-counter ("OTC") medicines and home and personal care products. Since 1918, Sterling has been the exclusive United States manufacturer of Bayer aspirin.[1] Bayer aspirin is Sterling's best known and largest selling OTC pharmaceutical product in the United States. During the past five years, Bayer aspirin sales have ranged between $137 and 160 million per year, accounting for 40 to 45 percent of Sterling's United States OTC sales. Sterling dedicates significant effort and investment to the promotion of the "Bayer" trademark. For example, Sterling spent between $40 and 60 million per year on promotion and advertisement of the Bayer trademark over the past five years.

AG is a German corporation and has its principal place of business in Leverkusen, Germany. AG, one of the world's largest corporations, manufactures and sells chemicals, healthcare products and imaging technologies. Since 1970, AG has owned the rights to the "Bayer" trademark and name throughout the world, except in the United States, Canada and certain parts of the Caribbean.[2]

Bayer USA is a Delaware corporation and a wholly owned subsidiary of AG. Defendant Mobay Corporation ("Mobay") is a New Jersey corporation engaged in the manufacture and sale of plastics and chemicals and a wholly owned subsidiary of Bayer USA. Defendant Miles Inc. ("Miles") manufactures and sells pharmaceuticals, diagnostic substances and medical diagnostic apparatus. Miles is a wholly owned subsidiary of Bayer USA incorporated under the laws of the State of Indiana.

## I. *Agreements Between Sterling and AG*

Over the years Sterling and AG have had numerous disputes and entered into several agreements concerning the use of the

"Bayer" trademark in this and other countries. *See, e.g.,* n. 1 & 2, *supra.* Following is a description of the parties' formal and informal agreements that are relevant to this lawsuit.

### A. The 1964 Agreement

In 1964, following a judicial determination that Sterling possessed absolute rights to the exclusive use of the Bayer trademark in the United States, *Farbenfabriken Bayer A.G. v. Sterling Drug, Inc.,* 307 F.2d 210, 212 (3d Cir.1962), *cert. denied,* 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963), Sterling and AG, then called Farbenfabriken Bayer AG, executed an agreement relating to the use of the "Bayer" name and trademark (the "1964 Agreement"). Dx. 1001. The 1964 Agreement permitted AG to use its corporate name in the United States under certain narrowly specified circumstances. Under the agreement, AG's use of the corporate name was limited essentially to package inserts, packaging of non-pharmaceutical goods sold in bulk, letterheads, reports to shareholders, and institutional advertising of non-pharmaceutical and non-consumer goods. The agreement also expressly prohibited AG from using the word "Bayer" or the Bayer Cross in connection with aspirin or other analgesics or "in the course of trade in any other goods." 1964 Agreement at ¶ 2.

### B. Modifications to the 1964 Agreement

AG informed Sterling by letter in 1970 that it planned to change its corporate name from Farbenfabriken Bayer AG to Bayer AG. The parties exchanged several letters in 1971 in connection with this name change, which resulted in modifications of the 1964 Agreement. Dx. 1009–11, 10014.

The modifications provided that AG would incorporate a United States subsidi-

---

**1.** Sterling's Bayer trademark is the subject of federal registrations No. 155, 382 of May 30, 1922, renewed; No. 155,612 of June 6, 1922, renewed; and No. 229,153 of June 21, 1927, renewed. Sterling acquired its rights to the Bayer trademark by purchasing the stock of The Bayer Company Inc., a subsidiary of a predecessor of AG, from the Alien Property Custodian after the stock was seized by the Custodian during World War I.

**2.** Sterling and AG executed an agreement on or about April 20, 1970, relating to the use of the "Bayer" name and trademark outside the United States. Dx. 1002. (References to "Px." and "Dx." herein are to Plaintiff's Exhibits and Defendants' Exhibits admitted in evidence.)

ary under a name other than "Bayer AG" and that the new subsidiary would be bound by the restrictions of the 1964 Agreement. Sterling also consented to the use of AG's new corporate name in the United States, but under more limited circumstances than had been permitted under the 1964 Agreement. For example, the 1964 Agreement permitted the use of the corporate name in certain institutional advertising, while under the 1971 modifications the new name was not permitted to be used in such advertising.

## C. Agreements Regarding the Press

In or about May 1975, representatives of Sterling and AG met to discuss planned interviews of AG's new chairman, Herbert Gruenewald ("Gruenewald"), by the American press. Sterling consented to Gruenewald identifying himself as the chairman of Bayer AG, to his discussion of the business of AG throughout the world and to the plants, products and volume of business conducted by Mobay, then AG's only United States subsidiary. Dx. 1024. Gruenewald was subsequently interviewed by the *New York Times*, which published an article based on the interview. Dx. 1026.

Sterling and AG representatives met again to discuss relations with the press in or around the fall of 1976. At that time, Sterling consented to AG holding a single press conference in which AG would report its financial results, its business activities and plans for the future.[3] Dx. 1889, pp. 10, 64–65. AG held such a press conference on or about March 22, 1977, which resulted in

the publication of various news articles about AG. Dx. 1032.

## D. The 1986 Agreement

### 1. *Negotiations Leading to the Agreement*

In or around the summer of 1983, AG learned of the existence of a firm in Detroit, Michigan, which was marketing disinfectants under the name "Bayer Chemical Manufacturing Corporation." AG, acting through a representative, paid $140,000 to purchase that company's trademark and trade name rights to use the name "Bayer" in or around December, 1983. Px. 42. At about the same time, AG also applied to the United States Patent Office to register the trademark "Bayer" for a variety of industrial chemicals and other products. Px. 41.

In or around January 1984, AG initiated discussions with Sterling concerning the resolution of what it described as a "gap" problem. Representatives of Sterling and AG met on or around January 18, and at this meeting AG revealed for the first time its purchase of Bayer Chemical Manufacturing Corporation's trademark rights. According to AG, Sterling had not been able to prevent the use of the "Bayer" name by companies operating outside of the pharmaceutical field and at the same time, AG was precluded from doing so by virtue of the restrictions on its use of the "Bayer" name in the United States under the 1964 Agreement.

---

**3.** AG contends that Sterling had already consented at the 1975 meeting to AG's use of its name in any communication with the press concerning its activities in the United States. The Court does not share defendants' view of the evidence on this point. Dieter Schaub ("Schaub"), a member of AG's board of directors, did write a memorandum shortly after the 1975 meeting that is consistent with AG's version of what took place. He later testified at his deposition, however, that the memorandum was never intended to memorialize the precise agreement reached by Sterling and AG, but was only meant to provide Schaub's colleagues on the board of directors of AG with a general idea of what was discussed. Dx. 1889 at 76.

Schaub also testified at his deposition that agreement was reached regarding the proposed

press conference at the 1975 meeting. *Id.* at 10–11. The other evidence presented on this issue does not support Schaub's testimony. Sterling's contemporaneous account of the 1975 meeting, contained in an internal memorandum, dx. 1024, mentions only the proposed interviews of Gruenewald, and Gruenewald was indeed interviewed following the 1975 meeting. There would have been no need for Sterling and AG to meet in 1976 to discuss plans for a press conference identical to the one that Sterling had allegedly already agreed to in 1975. In addition, AG held its press conference only after the 1976 meeting took place. The Court therefore concludes that Sterling agreed to the interviews of Gruenewald at the meeting held in 1975 and to the press conference at the 1976 meeting.

Sterling, while not agreeing with AG's view that a "gap" problem existed, agreed to negotiate an expansion of AG's rights to use the "Bayer" name. The parties met numerous times over the next two years, exchanged drafts of an agreement, and discussed those drafts. The principal negotiators at these meetings were James H. Luther ("Luther"), Sterling's general counsel, and Volker Charbonnier ("Charbonnier"), a member of AG's legal department.

Initially, the negotiations focused on several alternative arrangements that would give AG increased rights to use the "Bayer" trademark. These alternatives included an option for AG to purchase Sterling's "Bayer" trademark; an exchange of Sterling's Glenbrook Laboratories, the division which produces Bayer aspirin, in return for Miles; or AG's acquisition of the right to use the "Bayer" name and the Bayer Cross in all product categories except pharmaceuticals. At a meeting that took place in or around January 1985, AG raised the possibility that its United States holding company, then called Rhinechem Corporation ("Rhinechem"), might change its name to allow it to be identified by the "Bayer" trade name. *See* Px. 57 at 4. Following this meeting, the parties circulated draft agreements that would permit such a name change.

Discussions reached an impasse in or around late September 1985. On or about October 31, 1985, senior management at AG wrote to John Pietruski, Sterling's chairman, proposing that the parties attempt to reach agreement on a "first major step" in resolving the two companies' concerns regarding the use of the "Bayer" name in the United States. Px. 110. This agreement would be limited to the use of the "Bayer" trademark and name in connection with non-pharmaceutical and· non-consumer products, the renaming of AG's United States holding company to Bayer USA Inc., and the acquisition of Sterling's optical brightener business by Mobay. Talks between the parties then resumed, with a view to reaching an agreement on these points.

## The Parties' Discussions Regarding "Consumer Advertising Media"

One issue that was discussed in connection with Rhinechem's name change was the use of the proposed new name, "Bayer USA Inc.," in consumer advertising media. Sterling sought to include language in the agreement that would prohibit any such use of the name.

On or about February 1, 1985, Sterling proposed the following restriction on the use of the "Bayer" trademark by AG: "No such mark or name may be advertised in any consumer publication (e.g., The New York Times, The Wall Street Journal, or Fortune) or in any other consumer medium (such as television or radio)." Px. 56 at 2. AG responded negatively to this proposed language, arguing that no limitations on the use of the "Bayer" name were necessary. Px. 64 at 3. Sterling then presented AG with a draft agreement on or about September 16, 1985, that prohibited the use of the name "Bayer" in "consumer advertising media." Px. 95. That draft contained the following examples of consumer advertising media: "television; radio; publications of general circulation such as The New York Times, or Fortune; direct mail to consumers; outdoor signs, etc." *Id.*

After receiving· the September 16 draft agreement, AG initially rejected any restriction of the use of the name "Bayer" in consumer advertising media, *see* Dx. 1111, 1114, but subsequently responded with a draft that gave as examples of permitted publications *Chemical Week, Business Week, Fortune, The Wall Street Journal,* and *The New York Times.* Px. 98. On or about October 2, 1985, Sterling responded with a draft agreement containing a provision regarding consumer advertising media identical to that found in its September 16 draft. Px. 108. In subsequent drafts, as well as in the agreement that was ultimately signed, no examples of consumer advertising media are listed. *See* Px. 118, 119, 130.

At trial, Luther testified that when it became apparent that agreement could not be reached on what constituted appropriate examples of consumer advertising media,

the parties resolved the issue by agreeing to include the only more general term, "consumer advertising media" in the final draft, without examples. Tr. at 192–98.[4] Charbonnier testified that during the discussions of the various September drafts, AG objected not only to Sterling's examples of consumer advertising media, but to the entire concept of "negative covenants," or restrictions, on the use of the name "Bayer". Tr. 1007. According to Charbonnier, the last time he discussed specific examples of consumer advertising media was before negotiations broke down in September 1985. Once negotiations resumed following AG's October 31 letter, the parties did not discuss examples of consumer advertising media again. Tr. 1015.

### 2. The Agreement

The parties' negotiations culminated in the execution of a letter agreement on or about January 2, 1986, which further modified the 1964 Agreement to allow AG to rename its United States holding company "Bayer USA Inc." and to register "Bayer" as a trademark for certain non-consumer and non-pharmaceutical goods (the "1986 Agreement"). Px. 139. Sterling received $25 million as consideration for its consent to the agreement.

The 1986 Agreement provides that Sterling will not object to the use of the name "Bayer (USA) Inc." so long as that company remains "a non-operating holding company, i.e., not trading in goods." 1986 Agreement at ¶ 1. The agreement prohibits the use of "Bayer (USA) Inc." in "consumer advertising media or in advertising, brochures or catalogues directed to the pharmaceutical trade." Id. In addition, the agreement provides that AG will not use the trademark or tradename " 'Bayer' in communicating with the pharmaceutical industry or consumers in general through product, institutional or company-identifying advertising or promotion." Id. at ¶ 2.

### II. Events Leading to the Initiation of this Lawsuit

Following the execution of the 1986 Agreement, defendants began to make extensive use of the name "Bayer USA Inc." and the "Bayer" tradename and trademark. During 1987 and 1988, Bayer USA conducted a nationwide corporate advertising campaign, which included numerous advertisements in The Wall Street Journal, Forbes, Fortune, Business Week and the "Business World" supplement to the Sunday New York Times. One advertisement used as part of this campaign describes Bayer USA as "a group of progressive, dynamic, forward looking companies like Miles Laboratories and Mobay Corporation." Px. 460a. Institutional advertisements for Bayer USA also appeared in numerous performance programs for cultural events in the Pittsburgh area between 1986 and 1990. Tr. 594–603.

Miles and Mobay began to appear in press releases issued by defendants, described as "Bayer USA Inc. compan[ies]" or "part of the Bayer USA group of companies." Press releases issued by defendants also describe Miles as "the healthcare company of Bayer USA Inc." and Mobay as "the chemical company of Bayer USA Inc." In addition, Miles placed employment advertisements in certain newspapers which refer to Miles as "a Bayer USA Inc. Company."

Defendants erected six billboards in the Detroit area containing a design in which the diamond-shaped Mobay mark is surrounded by a rectangle that also holds the Bayer mark. These signs all contain advertisements for Mobay industrial products such as polymers. One of these billboards, on the highway serving the Detroit airport, contains a panel that flashes the words "Bayer/Mobay" periodically. According to the Michigan Department of Transportation, the average daily traffic past this sign totals over 200,000. Px. 376. In addition to these signs, numerous signs containing the name "Bayer" or the words "a Bayer

---

4. "Tr." refers to the transcript of the trial in this action, conducted between July 1 and July 23, 1991.

USA Inc. Company" have been erected at the headquarters of Mobay and Bayer USA, and at Mobay manufacturing locations around the United States.

Between 1986 and 1990, defendants sponsored several symposia in the United States attended by members of the American medical and pharmaceutical communities. The literature prepared for these symposia uses the "Bayer" name, and in one case, the Bayer Cross, in connection with defendants. Px. 464, 466-68, 475. The program for one symposium, entitled the "Bayer AG Centenary Symposium," lists representatives of pharmaceutical companies as participants. Px. 476 at B195578.

In or about 1989, AG was one of several companies which sponsored a United States television broadcast of *Messa per Rossini.* At the end of the broadcast, the name "Bayer AG" appeared on the television screen. Tr. 619-22.

Beginning in 1987 and continuing through 1991, Bayer USA sponsored radio broadcasts of "The German Hour" program in Pittsburgh, Pennsylvania. During these broadcasts, the name Bayer was spoken over the airwaves, but pronounced in the German fashion (i.e., "buy-er"). Bayer USA also made a substantial monetary contribution to a Pittsburgh radio station, in return for which the station renamed its facility the "Bayer USA Broadcast Center for the Arts." Tr. 633. Defendants were advised that the name on the radio station building would "be visible each day to thousands of commuters and visitors to the Oakland section of the city," px. 231, and that the name "Bayer USA Inc." would be announced on the programs produced at the facility. Tr. 635.

Defendants have distributed various corporate gift items containing the words "Bayer/Mobay," "Bayer USA Inc." or "Mobay—A Bayer USA Inc. Company" to their employees, Mobay's customers of agricultural and industrial chemical products and visitors to Bayer USA's office in Pittsburgh. These items include, among others: pens, pencils, T-shirts, calculators, pocket knives, towels, hats, golf umbrellas and frisbees.

Sterling has objected to various aspects of defendants' conduct on several occasions. Tr. 163-79. In addition, the parties met at least once in 1987 to discuss their differences regarding the scope of conduct permitted under the 1986 Agreement. Tr. 180-86.

From February 1989 until May 1990, the parties engaged in negotiations concerning the possible exchange of Sterling's Bayer business for certain of defendants' assets. Tr. 1550-97. At the same time as these business discussions were taking place, Sterling and defendants also discussed the propriety of defendants' conduct with respect to the use of the "Bayer" trademark. The business negotiations ultimately proved unfruitful, and Sterling initiated the instant action on May 21, 1990.

### III. *Procedural History of this Lawsuit*

On October 3, 1990, Sterling moved for a preliminary injunction enjoining defendants from using the name or mark "Bayer" in a manner likely to reach consumers, the general public or the pharmaceutical industry or in any other manner inconsistent with the parties' agreements. This Court denied Sterling's motion in a Memorandum Decision dated April 18, 1991 and directed that trial on the merits of plaintiff's claims begin on July 8, 1991. By agreement of the parties, the trial date was advanced and trial commenced on July 1, 1991 and continued through July 23, 1991.

At the conclusion of trial, the parties requested and the Court granted permission to submit post-trial briefs. The parties subsequently sought permission to supplement the record with certain exhibits relating to the reorganization of Bayer USA and Sterling. The Court received these exhibits in evidence and ruled on other evidentiary motions at a conference held on February 28, 1992.

### IV. *Corporate Reorganization of Bayer USA*

Effective January 1, 1992, Bayer USA, Mobay, Miles and Agfa Corporation were

merged into a single corporation named Miles Inc.[5] Dx. 1953. Under the reorganization, the new Miles Inc. is an operating company and a wholly owned subsidiary of AG. *Id.* While an entity named "Bayer USA Inc." will continue to exist, defendants have no current plans to use the name "Bayer USA Inc." in the United States, except for a brief transitional period. Tr. 675, 758. Defendants do intend to identify Miles Inc. as a "Bayer AG Germany company" in press communications in the future. *Id.* at 675, 759–60. In addition, defendants may continue to use the "Bayer" name in connection with the industrial chemicals for which they registered the "Bayer" trademark pursuant to the 1986 Agreement. *Id.* at 676.

## DISCUSSION

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 1367 and 15 U.S.C. § 1121.

Sterling contends that defendants' actions have systematically violated the 1964 Agreement as modified by the 1986 Agreement, as well as Sterling's rights under the Lanham Act and state law. According to Sterling, defendants' willful conduct warrants a broad injunction prohibiting all of the actions of which Sterling complains. In addition, Sterling contends that defendants' bad faith in infringing Sterling's trademark rights entitles it to recover attorneys' fees under Section 35 of the Lanham Act. 15 U.S.C. § 1117(a).

Defendants maintain that the 1986 Agreement never prohibited them from communicating with the press and is ambiguous with respect to Bayer USA's right to use its name in various media. According to defendants, evidence presented at trial reveals that most if not all of defendants' conduct was permitted under the 1986 Agreement. Defendants contend that the parties' agreements render trademark law inapplicable to this case, and that even were it applicable, Sterling has failed to show that any of defendants' conduct constitutes infringement of Sterling's rights.

The parties also predictably differ in their views as to the effect of Bayer USA's reorganization and name change on the issues in this case. Sterling argues that press coverage of Bayer USA's reorganization provides additional evidence of confusion generated by Bayer's press relations policy. AG contends that the name change moots Sterling's claim. The Court will address the parties' contentions in turn.

### I. *Sterling's Rights Under the 1964 and 1986 Agreements*

The initial question to be addressed is whether and to what extent defendants' conduct violates their contractual obligations to Sterling.

### A. "Consumer Advertising Media"

The 1986 Agreement provides that defendants "will not use 'Bayer (USA) Inc.' in consumer advertising media or in advertising, brochures or catalogues directed to the pharmaceutical trade." 1986 Agreement at ¶ 1. Plaintiff argues that virtually every use of the name "Bayer USA Inc." at issue here has been made in consumer advertising media. Defendants contend that the term "consumer advertising media" is ambiguous, and that evidence of the parties' negotiations and other extrinsic evidence reveals that their uses of "Bayer USA Inc." were intended by the parties to be permitted under the agreement.

### 1. *Ambiguity of the Term*

■ Under New York law, which governs both the 1964 and 1986 Agreements[6], the Court must look first to the parties' written agreement to determine the parties' intent and limit its inquiry to the

---

5. Sterling also effected a corporate reorganization and changed its corporate name to "Sterling Winthrop," effective October 2, 1991. Dx. 1952. Sterling's reorganization has no relevance to the issues presented in this case and the Court will continue to refer to it as "Sterling."

6. While the 1986 Agreement does not contain a choice of law clause, it is a modification of the 1964 Agreement, which does provide that New York law governs its interpretation. 1964 Agreement at ¶ 16.

words of the agreement itself if the agreement sets forth the parties' intent clearly and unambiguously. *Nicholas Laboratories Ltd. v. Almay, Inc.*, 900 F.2d 19, 20–21 (2d Cir.1990). The question of whether a particular term of a contract is ambiguous is one of law. *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987) (citing *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982)).

▪ Contract language is not ambiguous if it has "a definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1283 (1978)). In determining the meaning of a contract provision, a court should give the language its natural and ordinary meaning. *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1990) *appeal denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991); *Carpenter v. Machold*, 86 A.D.2d 727, 447 N.Y.S.2d 46, 47 (1982). Language whose meaning is otherwise plain is not rendered ambiguous simply because the parties urge different interpretations in litigation. *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990).

▪ Defendants maintain that the parties' inability to agree on which publications and other media to list as examples of "consumer advertising media" during the negotiation of the 1986 Agreement demonstrates that the term is ambiguous. In advancing this argument, defendants take the anomalous position that the Court should consider extrinsic evidence in order to determine whether extrinsic evidence should be considered in determining the parties' intent. Extrinsic evidence is not admissible to show the existence of ambiguity in an otherwise unambiguous document, however. *Adler & Shaykin v. Wachner*, 721 F.Supp. 472, 479 (S.D.N.Y. 1988) (citing *Western Union Telegraph Co.*

*v. American Communications Ass'n*, 299 N.Y. 177, 86 N.E.2d 162 (1949)).

Moreover, even were the Court to take into account the parties' negotiations over the term "consumer advertising media," those negotiations do nothing to undermine the Court's conclusion that the term is unambiguous. The evidence shows that the parties attempted to include a list of examples of consumer advertising media in the agreement and, at the time negotiations broke down in September 1985, were unable to agree on which examples to include. Following AG's reinitiation of discussions at the end of October, the negotiators decided to drop the idea of examples in the interest of rapidly concluding a more simplified transaction than had been originally contemplated.

▪ The Court is of the view that "consumer advertising media" as used in the 1986 Agreement is not ambiguous. The term is commonly understood to describe media containing advertising, available to a broad spectrum of the public, and, at least with respect to publications, containing items of general interest. While individuals might disagree as to whether a particular publication or other medium of communication possesses these qualities, there is no reasonable ground for disagreement that these are the qualities the term describes.

### 2. *Extrinsic Evidence Offered by Defendants*

▪ Defendants point to a host of extrinsic evidence in an attempt to show that their use of the name "Bayer USA Inc." is consistent with the parties' understandings as memorialized in the 1986 Agreement. Since the Court has determined that the term "consumer advertising media" is unambiguous, it may not refer to such evidence in interpreting that term. *Hunt Ltd. v. Lifschultz Fast Freight, Inc., supra*, 889 F.2d at 1277. Furthermore, the extrinsic evidence defendants advance does not support their interpretation of the term "consumer advertising media." Defendants place great weight on the fact that during the negotiations, the *Wall Street Journal*

appeared as an example of consumer advertising media in one of Sterling's draft agreements but not in a later draft. According to defendants, this omission amounts to a concession on the part of Sterling that the *Wall Street Journal* is not a consumer advertising medium.[7]

The evidence of the negotiations shows that the listed examples of consumer advertising media usually changed from one draft to the next and that each of the parties prepared draft agreements that included examples of consumer advertising media with which the other side did not agree. The Court therefore concludes that no particular inference can fairly be drawn from plaintiff's omission of the *Wall Street Journal* in certain of its drafts.

Defendants also seek to rely on statements made by AG's negotiators expressing concern that Bayer USA be able to communicate with the financial world as evidence that it was consistent with the parties' intent to allow defendants to use the name "Bayer USA Inc." in *Fortune, Forbes,* the *New York Times, Business Week* and the *Wall Street Journal.* Defendants' argument is essentially that the 1986 Agreement should not be interpreted to restrict them in any way from communicating with the business community because of their expressed desire to do so during the negotiations. However, Sterling representatives made equally forceful statements during the negotiations concerning Sterling's ability to protect its rights in the "Bayer" trademark. Were the Court to rely exclusively on one or the other of the parties' statements during negotiations as a guide to interpreting the 1986 Agreement, it would be required in either case to ignore certain express provisions of that agreement. This evidence if anything underscores the importance of relying exclusively on the finalized agreement to determine the parties' intentions.

Next, defendants point to their own conduct following the signing of the 1986 Agreement as evidence that Sterling's understanding of the term "consumer advertising media" was consistent with their own. According to defendants, Sterling was aware of their institutional advertising and other activities. Defendants argue that Sterling's failure to object to these activities demonstrates that it viewed them as consistent with the parties' agreements.

■ Even were it proper for the Court to consider the parties' conduct following the signing of the 1986 Agreement as evidence of the meaning of that agreement, *see* discussion in Section B, *infra,* that evidence does not establish that Sterling viewed defendants' conduct as consistent with the 1986 Agreement. Defendants presented evidence that executives at Sterling were aware that defendants' institutional advertisements appeared in certain publications and that Sterling did not object to the advertisements appearing in those specific publications at the time that they ran. Tr. 318–40; 342–44. Evidence was also presented that Sterling did write to Bayer USA objecting to identical advertisements that appeared in other publications at approximately the same time. Tr. 340–41. Defendants argue that this sequence of events shows that Sterling considered the publications that it did not mention in its objection letters to fall outside the definition of "consumer advertising media." An equally plausible reading of this evidence, however, and that which the Court adopts, is that Sterling viewed its letters as sufficient to put Bayer USA on notice that it objected to all of the institutional advertising that ran at the time the letters were sent.

### 3. Defendants' Use of the Name "Bayer USA Inc." in Various Media

■ Having concluded that the extrinsic evidence advanced by defendants is neither

---

7. Charbonnier testified that he believed that Sterling had conceded that the *Wall Street Journal* was not a consumer advertising medium because all examples of such media were dropped from its drafts after October 1985. Tr. 1017–18. However, Charbonnier also admitted that the parties never discussed the significance of the omission of the *Wall Street Journal* from one of Sterling's drafts. Tr. at 1271–72. The objective of contract interpretation is to give effect to the expressed intent of the parties, and not to their private, unexpressed understandings. *See Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1271 (2d Cir.1989); *Hunt Ltd. v. Lifschultz Fast Freight, Inc., supra,* 889 F.2d at 1278.

relevant nor helpful to defendants' position, the Court will now turn to the question of whether defendants' use of the name "Bayer USA Inc." is prohibited by the 1986 Agreement. The publications in which defendants ran their institutional advertisements—*Fortune, Forbes, Business Week,* the "Business World" supplement to the *New York Times* and the *Wall Street Journal*—all clearly fall within the meaning of "consumer advertising media." Extensive evidence was produced at trial establishing the broad-based readership of these publications, as well as the fact that these publications feature news articles of general interest. Tr. 539–55; px. 506A. Each of the publications also carries extensive advertising of consumer products and services. *See* dx. 1718, 1721, 1732, 1743.

Similarly, the performance programs in which defendants ran institutional advertisements constitute consumer advertising media. The performances in question were ballets, symphonies and musicals, all events of interest to the general public. *See* px. 461. The programs were distributed to anyone who attended a performance. Tr. 598. The general circulation newspapers, such as the *Chicago Tribune* and the *New York Times,* in which Miles' ran employment advertisements identifying itself as a "Bayer USA Inc. Company" are also consumer advertising media.[8] *See, e.g.,* px. 462a at B152707.

The signs containing the words "Bayer USA" stand on a slightly different footing than defendants' advertisements, because they have a functional as well as a promotional purpose. Defendants contend that these signs merely identify Bayer USA's headquarters and various Mobay facilities around the country. While it is certainly true that many companies use similar signs to identify their facilities, these companies are not under an obli-

gation to keep their company names out of consumer advertising media. Moreover, the prominence of these signs and their placement in heavily travelled areas leads the Court to conclude that they fall within the prohibition of the 1986 Agreement. *See* Px. 438–39; 562–64; tr. 666.

Finally, using the name "Bayer USA Inc." in radio broadcasts and on items such as T-shirts and frisbees plainly constitute the use of the name in consumer advertising media. Indeed, defendants do not seriously contest this characterization. Defendants point out that the name "Bayer" was given its German pronunciation when spoken over the airwaves. The 1986 Agreement contains no exception for German pronunciation, however.

Defendants argue that none of the above uses of the name "Bayer USA Inc." run afoul of the 1986 Agreement because these uses were designed to reach the business and financial communities and were not intended to target consumers. The language of the agreement, however, belies such an interpretation. While the agreement states that defendants will not use the name in "advertising ... *directed* to the pharmaceutical trade," it contains no such limitation on defendants' obligation to refrain from using the name in consumer advertising media. 1986 Agreement at ¶ 1. Accordingly, the Court concludes that the use of the name "Bayer USA Inc." in defendants' institutional advertising campaign, in performance programs, on signs identifying certain of defendants' facilities, in radio broadcasts and on various gift items violates the 1986 Agreement.

## B. Press Relations

■ Defendants contend that none of the parties' agreements places any limitation on defendants' right to communicate

---

8. Defendants argue that the "help wanted" sections of the newspapers in which these advertisements ran do not constitute consumer advertising media, because they will be read only by persons seeking employment and not by consumers in general. Even if the classified advertising section of a newspaper could properly be considered to be separate from the balance of the paper, the Court does not believe that the

"help wanted" portion of the classified section can be meaningfully separated from the other classified advertisements. Since the classified advertising section of a newspaper typically contains advertisements of interest to consumers in general, the Court finds no reason to conclude that this section would be read by a narrower group of people than the general leadership of the newspaper in question.

with the press. This position is based on defendants' reading of the 1964 Agreement, the discussions between the parties in the mid–1970's and defendants' relations with the press in the United States since that time.[9]

The 1964 Agreement provides that AG and its affiliates will not use a corporate name containing the word "Bayer" or the trademark "Bayer" "in connection with Aspirin or other analgesics" or "in the course of trade in any other goods." 1964 Agreement at ¶¶ 1, 2. According to defendants, press relations fall outside of "the course of trade in … goods," and therefore the 1964 Agreement places no limitation on their communications with the press in the United States.

■ The Court cannot agree with defendants' reading of this agreement. "The course of trade in … goods" is descriptive of the day-to-day operations of a company that produces products and services. Press relations may thus fall within or outside of "the course of trade in … goods," depending on the type of communication made to the press. Were there any doubt on this point, it was clarified by defendants in the 1971 correspondence modifying the 1964 Agreement at the time of AG's name change. In one of the letters that form part of this correspondence, AG's representative, Dr. Friedrich Silcher, states that the term is defined as:

> with respect to the manufacture, use, sale, or other distribution, advertising and promotion of any product [sic] or services of [AG] and/or its subsidiaries,

or the supplying of any information with regard thereto.

Dx. 1011 (emphasis supplied). This language explicitly forecloses defendants' restrictive reading of the term "the course of trade in … goods."

Defendants next contend that in 1975, Sterling agreed that AG was permitted to use its name in communicating with the press about its activities in the United States. The record does not show that Sterling agreed to any such broad use of the name "Bayer" in communications with the press. As discussed above, the evidence establishes only that in 1975 Sterling consented to certain interviews of AG's new chairman, and that at a subsequent meeting in 1976, Sterling agreed that AG was permitted to hold a single press conference in the United States to discuss its financial results and plans for the future. See pp. 1360–1361 & n. 3, supra.

Finally, defendants contend that the continued issuance of press releases in the United States by AG and its subsidiaries since the mid–1970's establishes that the parties understood that defendants were entitled to communicate freely with the press in this country. When a contract is unambiguous, there is "no need … to examine the conduct of the parties over the intervening years to ascertain their intent." Int'l Klafter Co. v. Continental Casualty Co., 869 F.2d 96, 100 (2d Cir.1989) (quoting Slatt v. Slatt, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099 (1985)). Neither party asserts that the contract language at issue here is ambiguous, and the

---

9. Defendants also argue that their right to use the name "Bayer" in communications with the press is entitled to protection under the First Amendment to the United States Constitution. According to defendants, the Court may not interpret the parties' agreements to effect a waiver of this right, because the agreements do not state with sufficient specificity that defendants have surrendered their right to use the name "Bayer" in communicating with the press.

Defendants' argument is inventive, but ultimately unavailing. The parties' agreements are clear in prohibiting defendants from using the name "Bayer" in certain types of communications with the press, as the discussion below points out. Moreover, prior to the execution of the 1964 Agreement, AG and its subsidiaries had

no right to use the name "Bayer" in communications with the press in the United States, since at that time Sterling possessed exclusive rights to the "Bayer" trademark in this country. Farbenfabriken Bayer A.G. v. Sterling Drug, Inc., supra, 307 F.2d at 212. The First Amendment does not create an exception to trademark infringement, even when that infringement occurs in communications with the press. See Levitt Corp. v. Levitt, 593 F.2d 463, 468–69 (2d Cir.1979); Madrigal Audio Laboratories, Inc. v. Cello, Ltd., 799 F.2d 814, 823 (2d Cir.1986). Therefore, to the extent that defendants' use of the word "Bayer" in their communications with the press violates the parties' agreements, it is not entitled to First Amendment protection.

**1370**

Court is also of the view that the meaning of the relevant provisions is plain. The Court therefore need not scrutinize defendants' dealings with the press over the past twenty years for clues as to the parties' understanding of what conduct was permitted by their agreements.[10]

Having considered and rejected defendants' arguments that the parties' agreements do not apply to contacts with the press, the Court must now determine what restrictions, if any, the agreements place on defendants' press communications and whether defendants' conduct comports with these restrictions. As stated above, the 1964 Agreement does not permit use of the name or trademark "Bayer" in press reports about defendants' products, services and other aspects of defendants' day-to-day operations. By contrast, extraordinary events such as changes in corporate control fall outside the "course of trade in ... goods." These events may therefore be reported in the press using the "Bayer" name without violating the strictures of the 1964 Agreement.

A question remains as to whether the 1986 Agreement in any way modifies defendants' obligations with respect to the press. The 1986 Agreement explicitly permits AG to rename its United States holding company "Bayer USA Inc." 1986 Agreement at ¶ 1. A first reading of this provision might appear to exempt the name "Bayer USA Inc." from the 1964 Agreement's prohibition on the use of a corporate name containing the word "Bayer" in the course of trade in goods. The remainder of the paragraph concerning the name change makes clear, however, that any use of the new corporate name is subject to the same restriction as that contained in the 1964 Agreement.

The 1986 Agreement provides that if AG's United States operating companies "are engaged in the trade in goods," the name "Bayer USA Inc." is permitted only so long as the renamed subsidiary is "a non-operating holding company, i.e., not trading in goods." *Id.* Thus, any activity relating to trade in goods must be conducted by the United States operating companies. Reading this restriction together with the 1964 Agreement's definition of the "course of trade in ... goods," it becomes clear that any communication to the press about the products, services or day-to-day operations of the operating subsidiaries must be conducted by the operating subsidiaries themselves and not through Bayer USA. Moreover, to read the 1986 Agreement to allow the operating subsidiaries to furnish routine communications to the press and simply append the name "Bayer USA Inc." to such communications, as defendants would apparently have this Court do, would render the foregoing provisions meaningless. The Court therefore concludes that the 1986 Agreement does not permit the use of the name "Bayer USA Inc." in press communications regarding the products, services and day-to-day operations of AG's United States operating subsidiaries.

Defendants' communications with the press since the signing of the 1986 Agreement contain numerous statements which make use of the name "Bayer USA Inc." in connection with reports on the day-to-day operations of the United States operating subsidiaries.[11] *See* px. 435a, e, g, i, k, m, q, s, u, w, y, aa, ac. In addition, many of these releases also refer to Bayer AG, a use which is not even arguably justified by the 1986 Agreement. The Court therefore concludes that defendants' use of the names "Bayer USA Inc.," "Bayer AG" and the word "Bayer" in their communications with the press violates the 1964 and 1986 Agreements.

10. Moreover, the numerous press releases proffered by defendants as evidence of their communications with the press do not establish that Sterling knew of or consented to such communications. The record shows rather that plaintiff objected on several occasions to press coverage of defendants' activities in the United States.

11. Several of these communications also appear to violate the provision of the 1986 Agreement which prohibits the use of the name "Bayer USA Inc." in "advertising ... directed to the pharmaceutical trade," 1986 Agreement at ¶ 1, since they promote pharmaceutical products produced by Miles. Px. 435k, m, q, u.

## C. Other Conduct

The remaining conduct challenged by Sterling requires little discussion. The billboards erected by defendants in which the names "Bayer" and "Mobay" appear together are in clear violation of the provision of the 1986 Agreement which reads: "We will not use the trademark and tradename 'Bayer' in communicating with ... consumers in general through product, institutional or company-identifying advertising or promotion." 1986 Agreement at ¶ 2. Defendants' argument that these billboards were not intended to communicate with consumers in general is without merit. While the billboards may well have been intended to reach only persons interested in purchasing Mobay's chemical products, they were available to be seen by anyone who passed by them. Moreover, they were placed along major highways where it was virtually certain that they would be viewed by thousands of consumers on a daily basis.

The use of the name "Bayer" at medical symposia sponsored by defendants and attended by members of the American pharmaceutical community violates defendants' obligation to refrain from using the name "Bayer" in "communicating with the pharmaceutical industry ... through ... company-identifying advertising or promotion." 1986 Agreement at ¶ 2. Defendants argue that AG's participation in these symposia is a necessary part of its research and development activity. Nothing in the parties' agreements prohibits AG or its affiliates from attending international research seminars. Defendants may not, however, prepare programs and other literature for seminars conducted in the United States that contain the name "Bayer" and in at least one case, the Bayer Cross without breaching their contractual duties to Sterling.

Finally, defendants' use of the "Bayer" name in sponsoring a national television broadcast of a classical music performance blatantly violates its obligations under the 1986 Agreement.

For the foregoing reasons, the Court concludes that with the exception of certain communications to the press, all of the conduct challenged by Sterling violates the prohibitions of the parties' contractual agreements.

## II. *Trademark and Unfair Competition Claims*

■■■■■ Sterling asserts that in addition to breaching the parties' agreements, defendants' conduct also violates its rights under sections 32(1) and 43(a) of the Lanham Act.[12] 15 U.S.C. §§ 1114, 1125(a). These provisions of the trademark law prohibit, respectively, the use in commerce of another's registered trademark or of any word or symbol if such use is "likely to cause confusion, or to cause mistake or to deceive." *Id.* Sterling also asserts a claim based upon New York common law princi-

---

12. Defendants contend that the existence of contractual agreements between the parties renders trademark law inapplicable to this case. According to defendants, Sterling's rights with respect to the use of the word "Bayer" must be exclusively determined by contract law.

Where trademark rights have been conveyed by contract, both contract and trademark law apply in determining the parties' rights and may provide separate grounds for relief. *See Murphy Door Bed Co. v. Interior Sleep Systems, Inc.,* 874 F.2d 95, 102 (2d Cir.1989) (although trademark invalid, injunctive relief properly based on contract rights); *Madrigal Audio Laboratories, Inc. v. Cello, Ltd., supra,* 799 F.2d at 823 (neither contract nor trademark law provide basis for injunction); *Levitt Corp. v. Levitt, supra,* 593 F.2d at 469 (injunction based on trademark law and contractual obligations). The case cited by defendants, *Affiliated Hosp. Prod. Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183 (2d Cir.1975), is not to the contrary. In that case, the conduct the plaintiff sought to enjoin as violative of its trademark rights was expressly permitted by the parties' contract. For this reason, the Court held there that the plaintiff was required to demonstrate that rescission of the contract was warranted before any claim of trademark infringement could be alleged. *Id.* at 1186.

In the instant case, Sterling claims that defendants' conduct violates both its rights under the 1964 and 1986 Agreements and its trademark rights. While the trademark laws could not provide a basis for relief unless there was a breach of contract, Sterling has established that defendants' conduct violated the parties' agreements and trademark law is thus relevant here.

ples of unfair competition.[13]

It is well settled that the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.

*Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 115 (2d Cir.1984) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). *See also Standard & Poor's Corp. v. Commodity Exchange Inc.*, 683 F.2d 704, 708 (2d Cir. 1982). To determine the likelihood of confusion, courts in this circuit consider the factors outlined in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):

[T]he strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

These factors are intended to serve as a useful guide to determining the ultimate question of likelihood of confusion, and are not to be applied as a rigid formula in each case. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986). Thus, a court "need only consider sufficient factors to reach the ultimate conclusion as to whether there is a likelihood of confusion." *Orient Express Trad-*

ing Co. v. Federated Department Stores, Inc., 842 F.2d 650, 654 (2d Cir.1988).

### A. Actual Confusion

■ Sterling contends that it has established compelling evidence of actual confusion through consumer surveys which it introduced at trial. Defendants criticize the methodology used to conduct plaintiff's surveys and offer their own survey which, they claim, demonstrates that no appreciable consumer confusion can be linked to their conduct.[14]

■ Surveys may provide direct evidence of actual confusion in trademark infringement actions, *see Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987), so long as they are fairly prepared and their results directed to the relevant issues. *Universal City Studios, Inc. v. Nintendo Co., supra*, 746 F.2d at 118. *See also Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir.1987).

Here, both plaintiff and defendants presented surveys designed to test the respondents' reactions to defendants' signs containing the word "Bayer."[15] The principal difference in methodology between the two surveys is that in plaintiffs' survey, respondents were shown pictures of defendants' signs and then asked what products were made by the companies shown in the sign, px. 493 at 2, while in defendants' survey, respondents were shown pictures of several scenes in the area, including pictures of defendants' signs, and then asked to state what thoughts passed through their minds the last time they had passed by those loca-

---

**13.** Unfair competition under New York law is shown by a likelihood of confusion, as is a claim under the Lanham Act. *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir.1980).

**14.** Defendants point out that Sterling may not use instances of confusion arising from conduct permitted under the parties' agreements to establish likelihood of confusion. The Court agrees that in order to prevail on its trademark claim, Sterling is required to show the existence of incremental confusion stemming from unau-

thorized uses of the name "Bayer," rather than confusion generated by defendants' legitimate use of the name. Sterling has, however, put forward evidence of such incremental consumer confusion, since the results of Sterling's consumer survey relate directly to conduct the Court has held to be unauthorized under the 1964 and 1986 Agreements.

**15.** Plaintiffs also presented a survey measuring reactions to a newspaper article and an advertisement containing the name "Bayer." Px. 504.

tions. Dx. 1783a at 3–4, main question-naire at 3.

Not surprisingly, the two surveys reached radically different conclusions regarding the levels of consumer confusion generated by the signs. In defendants' survey, 3% of respondents reported that thoughts of Bayer aspirin or aspirin in general passed through their mind the last time they saw defendants' sign. *Id.* at 7–8. By contrast, 74.6% of respondents to plaintiff's survey reported that the company shown in the "Bayer USA" headquarters sign made Bayer aspirin or aspirin in general, px. 493 at 2, while 42.4% of the respondents stated that the company shown in a sign outside a Mobay facility reading "Mobay—A Bayer USA Inc. Company," made Bayer aspirin or aspirin in general. *Id.*

The Court finds that plaintiff's survey was fairly prepared, directed to the relevant issue, and not suggestive of any particular response. *See Universal City Studios, Inc. v. Nintendo Co., supra,* 746 F.2d at 118. Defendants criticize plaintiff's survey because rather than containing open-ended questions, it asked the respondents to think of products. This question, however, goes directly to the relevant issue—whether defendants' conduct created confusion as to the source of the parties' products.

In stark contrast to plaintiff's survey, defendants' survey appears to have been designed to obfuscate the relevant issues. The pictures of scenes surrounding defendants' signs simply serve to distract the survey respondents as much as possible from noticing the signs. In addition, the stilted wording of the questions in defendants' survey leads respondents away from fully stating what they associated with defendants' signs. Indeed, when asked what products were made by the company shown in the "Bayer USA" sign, 61% of respondents in defendants' survey said aspirin or Bayer aspirin, while 35% of those shown the "Mobay—A Bayer USA Inc. Company" sign gave a similar response. Dx. 1783a at 8. Such responses reveal that when asked a fair question, respondents to defendants' survey showed a high level of confusion in response to defendants' signs. Therefore, the Court concludes that the survey evidence presented by both plaintiff and defendants demonstrates that actual consumer confusion was generated by defendants' unauthorized conduct.

**B. Defendants' Good Faith**

The question of defendants' good faith in adopting the "Bayer" mark is a difficult one. Unlike the typical trademark infringement case, defendants here had a contractual right to make use of plaintiff's trademark in certain specified situations. Thus, the fact that defendants deliberately made use of plaintiff's trademark does not in and of itself establish that defendants acted with intentional disregard for plaintiff's rights.

Sterling argues that defendants' conduct willfully violates the 1986 Agreement and is part of a concerted effort on defendants' part to dilute the value of Sterling's trademark. In support of this argument, Sterling points to numerous internal corporate documents of defendants that indicate defendants' desire to obtain unlimited use of the "Bayer" name and mark in the United States. Defendants point out that for years prior to the institution of this lawsuit, the parties contemplated a further transaction that would enable AG to broaden its rights to use the name "Bayer" in the United States. They maintain that their internal memoranda reflect nothing more than the hope that they would obtain those rights and their plans to use such rights if such a transaction were consummated. Sterling did not present evidence at trial which would refute this interpretation.

Sterling next argues that the sheer breadth and volume of defendants' efforts to promote the "Bayer" name belies any claim of good faith. While the Court might have been inclined to agree with this view at the close of trial, AG's reorganization of its United States operations must now be considered, and, to some extent, casts defendants' actions in a new light. Plaintiff points out that defendants took this action

only after litigation was commenced in this case, and argues that Bayer USA's name change does not indicate defendants' good faith, but is simply a sign of recognition that defendants' conduct is not permitted under the parties' agreements.

While it would certainly have been preferable if defendants' corrective actions had been taken earlier, AG's consolidation of its United States identity under a new name nonetheless greatly diminishes the scope and intensity of the parties' disputes. *See* dx. 1953. Although it is a close question, under the circumstances the Court concludes that the record does not adequately reveal whether defendants' use of the "Bayer" name and trademark was based on their good faith reading of the parties' contracts. Therefore, this factor does not favor either plaintiff or defendants.

### C. Other Polaroid Factors

The remaining *Polaroid* factors largely favor Sterling. Because Sterling's "Bayer" mark is registered, it is entitled to a presumption of distinctiveness, warranting the highest level of protection. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., supra,* 799 F.2d at 873. Although not required to put forward evidence of secondary meaning in order to gain protection of its mark, *McGregor–Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1132 (2d Cir.1979), Sterling has submitted evidence regarding its market strength, advertising budget and market research, all of which support the strength of the Bayer mark. The fact that the two marks are virtually identical also weighs in Sterling's favor.

The next factor, proximity of the products, favors Sterling. While many of defendants' products, such as Mobay's industrial chemicals, are quite dissimilar to Sterling's Bayer aspirin, Miles and Sterling both compete in the OTC pharmaceutical market. Miles' "Alka–Seltzer" products all contain analgesics, including in at least one case, aspirin.

The question of whether Sterling will bridge the gap, the next *Polaroid* factor, favors AG, except to the extent that Miles and Sterling already directly compete. Sterling is unlikely to move into the market for chemical and industrial products in which defendants' currently use the "Bayer" name. The quality of defendants' products is also a factor which favors AG, since the high quality of defendants' products is uncontested.

The final *Polaroid* factor, sophistication of the purchasers, favors Sterling. Sterling's aspirin customers are not drawn from any particular segment of the population and may be assumed to be relatively unsophisticated. Defendants argue that the relevant universe to be considered in determining purchaser sophistication is comprised of the purchasers of their products rather than those of Sterling. Defendants misapprehend the relevant standard, however. "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979). Moreover, even were the universe of relevant purchasers limited to defendants' customers, defendants offer no rationale as to why this universe should exclude the purchasers of Miles' OTC pharmaceutical products, or why Miles' customers should be more sophisticated than those of Sterling.

Having examined all of the relevant factors, the Court finds that Sterling has demonstrated a likelihood of confusion arising from defendants' unauthorized use of the "Bayer" trademark and name. Sterling is therefore entitled to prevail on its trademark and unfair competition claims.

### III. *The New York Anti–Dilution Statute*

■ In addition to its Lanham Act claim, Sterling has asserted a claim under the New York Anti–Dilution Statute.[16]

---

**16.** Defendants raise for the first time in their post-trial reply brief the argument that application of the New York anti-dilution statute to their conduct would violate the Commerce and Supremacy Clauses of the United States Constitution. In light of defendants' failure to present this argument until their final submission in this case and the fact that plaintiff's anti-dilu-

N.Y.Gen.Bus.Law § 368–d. The statute affords injunctive relief when a plaintiff can show a strong and distinctive mark and a likelihood of dilution of that mark due to defendant's infringement. *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030–31 (2d Cir.1989). The plaintiff need not show, as in a Lanham Act claim, that its product competes with defendant's product or that a likelihood of confusion exists. *Id.* at 1030.

■ Courts applying the Anti–Dilution Statute have likened its distinctiveness requirement to the strength of a mark for trademark infringement purposes. *Id.; Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983). While the Anti–Dilution Statute protects only extremely strong marks, *Sally Gee, Inc. v. Myra Hogan, Inc., supra,* 699 F.2d at 625 (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 545–46, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)), plaintiff's "Bayer" mark falls within this category. Indeed defendants' own expert witness testified that the public's recognition and association of the "Bayer" mark with Bayer aspirin is among the highest possible for any mark. Tr. 1642–43.

In order to establish the second element of an anti-dilution claim, likelihood of dilution, a plaintiff must show either that the defendant's use of the mark tends to blur a mark's product identification or that it tarnishes the affirmative associations a mark has come to convey. *Sally Gee, Inc. v. Myra Hogan, Inc., supra,* 699 F.2d at 625. Sterling argues that defendants' use of the "Bayer" name beyond what is permitted under the parties' contracts is certain to dilute the established distinctiveness of Sterling's mark. Defendants respond that the 1986 Agreement authorizes uses of the "Bayer" mark, such as its use on industrial chemicals, which will inevitably lead to some dilution. According to defendants, Sterling has failed to show that any additional dilution is likely to result from their unauthorized uses of the mark.

The parties' contracts allow defendants to use the "Bayer" mark in connection with certain non-consumer and non-pharmaceutical goods. While it is true that these uses might tend to dilute Sterling's mark to some degree, defendants' wholesale association of the "Bayer" name with their entire range of products is likely to cause "blurring" of the mark far beyond that for which the parties bargained. The Court therefore concludes that plaintiff is entitled to prevail on its claim under the New York Anti–Dilution Statute.

### IV. *Relief*

A. Sterling's Entitlement to an Injunction

■ Sterling's success on its Lanham Act claim entitles it to injunctive relief against defendants. The basic touchstone for injunctive relief under the Lanham Act is the likelihood of confusion. *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.,* 308 F.2d 196, 200 (2d Cir.1962). While Sterling was not required to demonstrate actual consumer confusion in order to obtain an injunction against defendants' infringing conduct, *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 170–71 (2d Cir.1991), actual confusion is the best evidence of likelihood of confusion. As noted above, Sterling did in fact establish that defendants' conduct gave rise to actual confusion.

Moreover, even if Sterling's trademark rights were not violated, injunctive relief would be proper here because defendants' conduct violated its contractual obligations with respect to the name "Bayer." *See Murphy Door Bed Co. v. Interior Sleep Systems, Inc.,* 874 F.2d 95, 102 (2d Cir. 1989).

Defendants contend that an injunction should not issue here, because they have voluntarily ceased much of the conduct about which Sterling initially complained. The fact that defendants have voluntarily discontinued a great deal of their offending conduct does not deprive Sterling of its right to an injunction. Injunctive relief

tion claim simply provides an alternative basis for the relief plaintiff seeks pursuant to the

Lanham Act, the Court declines to reach these constitutional questions.

remains appropriate so long as future violations of plaintiff's rights are threatened. *Menendez v. Saks and Co.,* 485 F.2d 1355, 1375 (2d Cir.1973), *rev'd on other grounds,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *see also Soto–Lopez v. New York City Civil Service Comm'n,* 840 F.2d 162, 168 (2d Cir.1988).

Here, defendants continue to own a company named "Bayer USA Inc.," and have not been willing to make a definitive statement about their future plans with respect to this company. In addition, defendants admit that they intend to use the name "Bayer" in conjunction with their new entity, Miles Inc., in routine communications with the press. As discussed above, such a use would not be authorized under the parties contracts. Thus, defendants' future violations of plaintiff's rights are not merely a threat, but a virtual certainty unless an injunction issues here.

### B. Scope of the Injunction

Sterling seeks a broad injunction, covering not only conduct that is prohibited under the 1964 and 1986 Agreements, but also proscribing conduct that would otherwise have been permissible. *See* Exhibit A to Plaintiff's Post–Trial Memorandum, filed under seal (proposed injunction). The Court agrees that a broad and stringent injunction is warranted here, particularly in light of defendants' concession that unless enjoined they will continue to violate their contractual obligations as well as Sterling's rights under the trademark laws. However, such an injunction may be crafted without prohibiting defendants from exercising the contractual rights for which they paid a very substantial sum of money. Therefore, the injunction should be tailored to permit defendants to make use of the name and mark "Bayer" to the extent provided for in the parties' agreements.

Defendants have raised numerous other objections to Sterling's proposed injunction. In light of the fact that plaintiff's proposed injunction must be substantially revised in order to reflect the discussion above, the Court is of the view that a detailed consideration of these objections is not appropriate at this time.

### C. Attorneys' Fees

 Sterling argues that defendants acted in bad faith in infringing its trademarks, establishing this as an "exceptional case" under section 35 of the Lanham Act, 15 U.S.C. § 1117, in which an award of attorneys' fees is appropriate. Deliberate and willful infringement can render a case "exceptional" for purposes of section 35, and thus support an award of attorneys' fees. *Centaur Communications, Ltd. v. A/S/M Communications, Inc., supra,* 830 F.2d at 1229. However, here, the Court has declined to find that defendants acted in bad faith. *See* pp. 1372–1373, *supra.* Accordingly, no award of attorneys' fees is warranted here.

### CONCLUSION

For the foregoing reasons, the Court holds that defendants have violated plaintiff's rights under the parties' contracts, the Lanham Act, the law of unfair competition and the New York Anti–Dilution Statute.

Settle injunction on notice.