United States Court of Appeals
Fifth Circuit

**F I L E D**

June 28, 2004

Charles R. Fulbruge III
Clerk

REVISED JULY 22, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No.  03-30470
_____


BRENNAN'S INC; OWEN E BRENNAN, JR; JAMES C BRENNAN; THEODORE
M BRENNAN

                Plaintiffs - Appellants - Cross-Appellees

        v.

DICKIE BRENNAN & COMPANY INC; RICHARD J BRENNAN, JR;

                Defendants - Appellees - Cross-Appellants

RICHARD J BRENNAN; COUSINS RESTAURANTS INC; SEVEN SIXTEEN
IBERVILLE LLC

                Defendants - Appellees

_____

        Appeals from the United States District Court
            for the Eastern District of Louisiana
_____

Before KING, Chief Judge, and BENAVIDES and CLEMENT, Circuit
Judges.

KING, Chief Judge:

    The plaintiffs, owners of a famous New Orleans restaurant

that bears their family name, brought trademark and contract

claims against certain relatives who operated other restaurants

that used the family name in ways that allegedly caused confusion

in the marketplace.  The district court ruled that the two

contracts that are the basis of the breach-of-contract claims barred the plaintiffs from pursuing trademark-related claims. The remaining claims proceeded to trial, and the jury returned a verdict in the plaintiffs' favor on one of their contract claims. Both sides appeal, challenging various aspects of the proceedings below. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

As habitués of New Orleans are well aware, members of the Brennan family are uncommonly blessed with a talent for restaurateuring. This case involves a dispute between two branches of the family over the names that may be used on certain restaurants.

The family's first restaurant, known since the 1950s as Brennan's Restaurant, was opened by Owen E. Brennan, Sr. In time, this restaurant came to be owned 60% by Owen Sr.'s widow Maude and their three sons--Owen Jr., James, and Theodore ("the brothers")--and 40% by the brothers' aunts and uncles, including Richard Brennan, Sr. ("Richard Sr."). The family registered BRENNAN'S as a federal trademark, and the family opened other restaurants as well. A disagreement arose between the two sides of the family in the early 1970s, resulting in a partition of the family restaurant enterprise. The original Brennan's Restaurant went to Owen Sr.'s widow and sons, while the family's other restaurants went to the brothers' aunts and uncles.

2

The partition did not solve all of the difficulties, and the Brennan's Restaurant side of the family sued the other side of the family in 1976 for trademark infringement. The litigation came to a close in 1979 with a settlement agreement ("the 1979 Agreement") and a consent judgment that defined the two camps' rights in the BRENNAN'S mark. Owen Sr.'s widow and sons received exclusive rights to the mark in Louisiana and all other states except Texas and Georgia, where Richard Sr. and his siblings held exclusive rights. The agreement further provided that (with some exceptions) no party would "open[] or operate[]" a new restaurant in Louisiana using the Brennan name, though the agreement also allowed the parties to "aid" their descendants' efforts to own or operate restaurants "under any name." Regarding future disputes that might arise, the 1979 Agreement stated that neither side would assert its trademark rights against the other for uses permitted by the agreement, but it also said that it did not bar future claims that might arise out of a breach of the agreement. Owen Sr.'s widow later died, and the three brothers continued to own and operate the original Brennan's Restaurant through Brennan's, Inc. ("Brennan's").

Business proceeded without incident for around twenty years. During that time, Richard Sr.'s son Richard Jr., known as "Dickie," began to establish his own name in the restaurant business. Unlike Richard Sr., Dickie was not a signatory to the 1979 Agreement. In the late 1990s, Richard Sr. gave Dickie and

3

another child a majority interest in the Palace Café restaurant, which began to be known as Dickie Brennan's Palace Café. At around the same time, Richard Sr., Dickie, and others decided to open a new restaurant, also in New Orleans, called Dickie Brennan's Steakhouse.

In July 1998, Theodore happened to notice a sign announcing the construction of Dickie Brennan's Steakhouse several blocks away from Brennan's Restaurant, and he informed his brothers. The brothers held a meeting with Dickie in September at which the parties discussed how to manage the use of the family name in connection with their respective restaurants. According to the brothers, Dickie concealed from them the fact that his father, Richard Sr., held ownership interests in the two restaurants bearing Dickie's name. The meeting produced an agreement between Brennan's and Dickie ("the 1998 Agreement") in which Brennan's promised that it "shall not object" to Dickie's operation of restaurants under the names "Dickie Brennan's Palace Café" and "Dickie Brennan's Steakhouse" "so long as": Dickie did not use the name "Brennan's" separately from "Dickie," the words "Dickie Brennan's" were not made more prominent than the rest of the name, Dickie did not use certain typefaces, and Dickie did not imply any connection with the original Brennan's Restaurant. Dickie also promised that he would not use the Brennan name in ways other than those specified in the agreement. The agreement further required Dickie to notify the brothers and take remedial

4

action if he became aware that his restaurants were being confused with the original Brennan's Restaurant.

Over the course of the next few years, the staff at Brennan's Restaurant noticed a number of instances in which the consuming public apparently confused their restaurant with Dickie Brennan's Steakhouse and vice versa, such as people going to one restaurant when they were looking for the other. Attorneys for Brennan's wrote to Dickie in March 2000 to request a meeting to discuss the apparent confusion, Dickie's alleged breaches of the 1998 Agreement, and remedial measures that Dickie could take. After meetings and letters failed to resolve the dispute, Brennan's sued Dickie and Dickie Brennan & Co. (the corporation through which the plaintiffs believed that Dickie was operating the restaurants) for breach of the 1998 Agreement, federal and state trademark claims, and other claims. The defendants filed a motion to dismiss for failure to join parties. Attached to the motion were affidavits stating that the Palace Café and Steakhouse restaurants were actually owned and operated by Cousins Restaurants, Inc. ("Cousins") and Seven Sixteen Iberville, L.L.C. ("Seven Sixteen"), respectively. The affidavits further stated that Richard Sr. and Dickie both held ownership interests in the two companies and that Dickie and the two companies were acting as successors to Richard Sr.'s rights under the 1979 Agreement. In response, Brennan's amended its complaint to add a claim for breach of the 1979 Agreement, to

5

join Richard Sr. and the two companies as defendants, and to join the brothers (who, like Richard Sr., were signatories to the 1979 Agreement) as plaintiffs. The defendants filed counterclaims asserting breach of the 1979 Agreement and, later, breach of the 1998 Agreement.

The district court made several rulings that narrowed the issues for trial. Relevantly for purposes of this appeal, the district court held that: (1) Richard Sr. had breached the 1979 Agreement by owning a minority share of Cousins and Seven Sixteen and otherwise contributing to those businesses; according to the district court, Richard Sr.'s activity amounted to the contractually forbidden "open[ing] or operat[ing]" of a restaurant, not the "aid" to a descendant permitted under the agreement; (2) the 1979 Agreement barred the plaintiffs from bringing trademark-related claims against Richard Sr., and the plaintiffs were accordingly limited to pursuing contract remedies against Richard Sr.; (3) the 1998 Agreement barred the plaintiffs from pursuing trademark-related claims against Dickie; the plaintiffs would therefore be limited to remedies for breach of contract unless they could show that the contract should be rescinded because of fraud or a serious breach; and (4) Cousins and Seven Sixteen could exercise the rights given to Dickie under the 1998 Agreement, and so the plaintiffs could not pursue trademark-related claims against those companies either. After the district court's pretrial rulings, the only matters that

6

remained for trial were the plaintiffs' claim that Dickie had breached the 1998 Agreement and their claim that Dickie had fraudulently induced them to enter into the agreement.[1]

The liability phase of the bifurcated trial began on October 28, 2002. On November 7, the jury returned its liability verdict. It found that the plaintiffs had not proved that Dickie fraudulently induced them to enter into the 1998 Agreement. On the breach-of-contract claim, the jury found that Dickie had breached the 1998 Agreement with respect to his Steakhouse restaurant--but not with respect to his Palace Café restaurant-- by using the Brennan name in a manner not permitted under the contract and by failing to take proper remedial measures to remedy the marketplace confusion of which he had become aware. The jury also found, however, that Dickie had acted in good faith and that the breach was not so serious as to justify dissolving the 1998 Agreement.

Since the 1998 Agreement remained in force, the district court's prior rulings limited the plaintiffs to contract remedies in the damages phase of the trial. During the liability phase, the plaintiffs had already presented testimony tending to show that some customers actually were confused as between Brennan's

---

[1] Although the court had granted summary judgment for the plaintiffs on their claim that Richard Sr. breached the 1979 Agreement, they did not pursue contract damages against Richard Sr. at trial. They instead elected to reserve their right to argue on appeal that trademark remedies were available.

Restaurant and Dickie Brennan's Steakhouse.  In the damages phase, the plaintiffs presented evidence from a single expert witness, William Legier.[2]  The defendants countered with their own expert, who severely criticized Legier's testimony.  On November 8, the jury returned an award of $250,000 to compensate the plaintiffs for Dickie's breach of contract, compared to the $2.2 million that plaintiffs' counsel had requested in closing arguments.  The district court entered judgment on the verdict and ordered Dickie to bring his conduct into compliance with the 1998 Agreement.

The plaintiffs now appeal, raising several issues.  Most importantly, they challenge the district court's rulings that the 1979 and 1998 Agreements bar them from pursuing all trademark-related claims against the defendants.  They additionally contend that they are entitled to judgment as a matter of law on their fraudulent inducement claim or, at least, that they are entitled to a new trial on that claim because the district judge erred in preventing them from asking Dickie a certain question on cross-examination.  They also complain that the judge erred in barring them from presenting evidence of the value of a reasonable royalty in the damages phase of the trial.  Dickie and Dickie Brennan & Co. have cross-appealed, contending that the district

---

[2]     The circumstances surrounding Legier's testimony form the basis of a cross-appeal and are discussed in greater detail in Part III.A.

court should have excluded the plaintiffs' expert testimony on damages and that, without said testimony, the damages award cannot stand.

## II. PLAINTIFFS' ISSUES ON APPEAL

A.    Rule 50 motion on fraudulent inducement

At trial, the plaintiffs asserted that Dickie had fraudulently induced them into signing the 1998 Agreement.  The jury found to the contrary.  The plaintiffs moved for judgment as a matter of law under Rule 50, but the district court refused to set aside the verdict.

We review the district court's ruling de novo, applying the same Rule 50 standard as did the district court.  See Coffel v. Stryker Corp., 284 F.3d 625, 630 (5th Cir. 2002).  Judgment as a matter of law is appropriate with respect to an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on that issue."  FED. R. CIV. P. 50(a)(1).  This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict.  Coffel, 284 F.3d at 630.  In considering a Rule 50 motion, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the court may not make credibility determinations or weigh the evidence, as those are jury functions.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

9

133, 150 (2000).  In reviewing the record as a whole, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  Id. at 151 (citation and internal quotation marks omitted).

The jury in this case was instructed that, under Louisiana law, fraud is "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party, or to cause a loss or inconvenience to the other." They were further instructed that fraud can occur through silence or inaction, as well as through affirmative misrepresentations.

The plaintiffs' argument relies heavily on the fact that Dickie admittedly did not inform the brothers during the September 1998 meeting that Richard Sr. was involved with Dickie's restaurants.  Moreover, the brothers testified at trial that Dickie made several specific remarks during the meeting that tended to suggest that Sr. would not be involved: that Richard Sr. had "retired," for example, and that Dickie was "going out on his own" to establish his own name.  Dickie did not deny making those statements but instead testified that he could not remember whether he made them.  The brothers also testified that they certainly would not have entered into the 1998 Agreement had they

10

known that Richard Sr. was involved.  Dickie admitted that he was aware of the animosity between Richard Sr. and the brothers' branch of the family, and he likewise admitted that he was aware that the 1979 Agreement limited his father's use of the family name.  On the basis of such evidence, the plaintiffs contend that a reasonable jury would be required to conclude that Dickie fraudulently induced the brothers into signing the 1998 Agreement by concealing Richard Sr.'s involvement.

We disagree.  A rational jury could have ruled as this jury did.  The evidence before the jury showed that it was the brothers who requested the meeting with Dickie, the brothers who proposed entering into an agreement concerning use of the BRENNAN'S mark, and the brothers who drafted the 1998 Agreement for Dickie to sign.  The jury also heard evidence that Dickie believed that he did not need the 1998 Agreement or any permission from Brennan's in order to open his restaurants under his name, casting doubt on his motive to deceive them.  Moreover, although the brothers testified that they were unaware of Richard Sr.'s involvement in Dickie's restaurants, there was evidence that permitted a rational inference that Dickie would have expected the brothers to have been exposed to this information through media reports and local scuttlebutt.  In sum, the jury rationally could have concluded that Dickie did not undertake fraudulently to induce the brothers into executing the 1998 Agreement.

B.    Request for a new trial on fraudulent inducement

The plaintiffs next ask for a new trial on their fraudulent inducement claim, contending that the district court improperly prevented them from inquiring into Dickie's state of mind.  In particular, the plaintiffs assert that the district court committed reversible error when it sustained defense counsel's objection to the question whether Dickie believed that the brothers would have entered into the 1998 Agreement had they known that Richard Sr. was involved in Dickie's restaurants.  The error is said to have occurred in the following exchange:

> Q:    Do you think they would have entered into the 1998 Agreement if they knew that your father was involved with the restaurant?
>
> A:    Mr. Colbert, when I look back over all the information that we have seen, I don't know how they weren't aware that my dad was involved.
>
> [Plaintiffs' counsel]:   Could I please have the question read back.

The court reporter read back the question, but, before Dickie answered, his attorney asked to approach the bench.  Dickie's attorney then objected to the question on the ground that it sought an answer to the ultimate question to be answered by the jury.  The plaintiffs' attorney responded that the question went to whether Dickie had a motive to conceal Richard Sr.'s involvement.  The court sustained the objection.

The plaintiffs face an uphill battle in appealing this ruling, for the district court's decisions regarding whether to

12

admit or to exclude testimony are generally reviewed only for abuse of discretion. Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 660 (5th Cir. 2002). Further, we will not reverse unless the error prejudices a party's substantial rights. FED. R. EVID. 103(a); FED R. CIV. P. 61.

We conclude that there was no reversible error here. Dickie indirectly answered the question the first time it was posed by stating that the brothers must have been aware of Richard Sr.'s involvement. His response amounted to a "yes" answer to defense counsel's question: Dickie said that the brothers must have known about Richard Sr.'s involvement, yet they signed the 1998 Agreement; therefore, according to Dickie, they would still sign even if they knew. There is no reason to think that Dickie would have provided a different answer if plaintiffs' counsel had been permitted to pursue the matter. Further, the court's ruling in no way prevented the plaintiffs from making their case. Even without Dickie's answer to this question (which answer would not have helped them), there was ample evidence from which a rational jury could have concluded that Dickie intended to deceive the brothers. The plaintiffs recount that evidence in detail and indeed argue, as explained in the previous section of this opinion, that no rational jury could reach a different conclusion based on the evidence before it. The plaintiffs' failure to convince the jury of fraud cannot reasonably be attributed to the

13

judge's decision to exclude this single question, even if the judge erred in sustaining the objection.

C.   Effect of the 1998 and 1979 Agreements on the plaintiffs' ability to bring trademark-related claims

We turn next to considering whether the district court erred in concluding that the 1998 and 1979 Agreements barred the plaintiffs from pursuing their trademark infringement and related claims[3] against Dickie, Cousins and Seven Sixteen, and Richard Sr.  We conclude that the district court erred in certain respects, but we also conclude that there are significant limitations on the plaintiffs' ability to obtain additional relief on remand.

1.   Trademark claims against Dickie

The district court held that the 1998 Agreement barred Brennan's from pursuing trademark-related causes of action against Dickie.  The court adopted the defendants' position that Brennan's was limited solely to contract remedies as long as the agreement remained in force; trademark remedies would be available only if Brennan's could avoid the agreement by proving fraud in the inducement or could prove a breach sufficiently serious to warrant dissolving the contract.  The jury found that there was no fraudulent inducement and, although the jury found a breach of the agreement, it found that the breach was not so

---

[3]     The plaintiffs' theories of recovery included not only standard trademark infringement but also other related theories of dilution and unfair competition.

14

serious as to vitiate the contract.  The 1998 Agreement thus remaining in force, the district court limited Brennan's to pursuing contract damages during the second phase of the trial.

A good portion of the argument in this court has involved the question whether the 1998 Agreement is a license agreement on the one hand or a consent-to-use agreement on the other.  A license gives one party the right to use another party's mark (i.e., to engage in otherwise infringing activity), generally in exchange for a royalty or other payment.  2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:79 (4th ed. 2004).  A consent-to-use agreement, again in the paradigm case, is a contract in which

> party A, the owner of a mark, consents to party Z's defined usage of a mark.  In effect, A promises not to sue Z so long as Z keeps within the limits of the defined zone of use. . . . That is, A admits that such defined usage is not an infringement and that A will therefore not sue Z for such usage.

Id.  In other words, a consent-to-use agreement "'[i]s not an attempt to transfer or license the use of a trademark . . . but fixes and defines the existing trademark of each . . . [so] that confusion and infringement may be prevented.'"  Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1076 (5th Cir. 1997) (alterations in original) (quoting Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co., 63 F. 438, 441 (7th Cir. 1894)).  Courts ordinarily will not find a licensing relationship when "an authorization of trademark use is structured in such a way as to avoid misleading or confusing

15

consumers as to the origin and/or nature of the respective parties' goods." Id. According to those principles, the 1998 Agreement is best described as a consent-to-use agreement rather than a license. Indeed, it expressly provides that the parties' aim in executing the agreement is "avoiding any confusion of the trade or public." It expressly requires Dickie to take remedial action to combat any consumer confusion that develops even in the absence of any breach.

With regard to licenses, the prevailing view is that one who exceeds the scope of the license is potentially liable not just for breach of the license agreement but also for trademark infringement. E.g., Franchised Stores of N.Y., Inc. v. Winter, 394 F.2d 664, 668-69 (2d Cir. 1968); Digital Equip. Corp. v. AltaVista Tech., Inc., 960 F. Supp. 456, 473-78 (D. Mass. 1997); see also 2 MCCARTHY § 18:42; 4 id. § 25:30.

According to the defendants, the situation is very different with regard to consent-to-use agreements. A party aggrieved by the breach of such an agreement, they claim, has recourse only to contract damages and may not sue for trademark infringement unless the contract is rescinded. That is, the defendants argue that the mark-holder who consents to a defined use is, so long as the contract persists, unable to pursue trademark remedies even when the consentee uses the mark in unauthorized ways. They cite the McCarthy treatise in support of that proposition, but while the treatise does discuss several aspects of consent-to-use

16

agreements, it does not set forth the proposition the defendants advance (though neither does it expressly reject it).  In a case that McCarthy cites as one of the earliest reported decisions to consider a consent-to-use agreement, the court seems to permit an action predicated on trademark infringement, not merely breach of contract, for a use that fell outside of the contract's permissions (though the hundred-year-old opinion is admittedly rather obscure).  See Waukesha Hygeia, 63 F. at 441.

In support of their position that the existence of the contract bars trademark actions, the defendants rely heavily on Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co., 513 F.2d 1183 (2d Cir. 1975).  There, game manufacturer Affiliated sued competing game manufacturer Merdel for trademark infringement, and the parties settled their dispute by executing a settlement agreement that regulated Merdel's use of certain names on its games.  Id. at 1185-86.  The agreement provided that Affiliated would not object to Merdel's use of the names as long as Merdel did not use them in a fashion more prominent than it was using them as of the date of the agreement, and it specifically provided that Merdel would not use the names to describe their game board.  Id. at 1186.  Finally, the agreement stated that there would be no restriction on Merdel's use of the names after a period of three years had elapsed.  Id.  A few years after executing the agreement, Affiliated sued Merdel again, claiming that Merdel had breached the agreement and

17

infringed its marks.  Id. at 1184-85.  The court of appeals ruled that the settlement agreement governed the parties' rights and that Affiliated would be limited to contract remedies--and have no recourse to trademark remedies--unless it could show that the contract should be rescinded because of fraud or grave breaches. Id. at 1186.

We do not think that Affiliated is controlling here. Although Affiliated complained that Merdel had acted outside the permissions in the contract during the three-year term, it also wished to bring an infringement action based on uses that the contract expressly permitted.  Recall that the key feature of the parties' contract in Affiliated was that it allowed Merdel unrestricted use of Affiliated's marks after a period of three years.  That contractual surrender of any right to object to Merdel's use of the marks is the main reason that the contract had to be avoided or rescinded before Affiliated could pursue an infringement case.  That consideration is not present in today's case.  We do not read Affiliated so broadly as to mean that any party that enters into a consent-to-use agreement is (absent rescission) limited to contract remedies even for infringing uses that are not authorized under the contract.  Such a rule would make the availability of trademark remedies dependent on whether a certain contract is labeled a licensing agreement or a consent-to-use agreement--an undesirable circumstance given that some agreements might not fit squarely into either box.  It would,

18

moreover, act as a trap for the unwary mark-holder, who could find himself stripped of trademark remedies (and potentially of a federal forum) when a consentee infringes his mark through unauthorized uses.

A more apposite case is <u>Sterling Drug Inc. v. Bayer AG</u>, 792 F. Supp. 1357 (S.D.N.Y. 1992), <u>aff'd in part and vacated in part</u>, 14 F.3d 733 (2d Cir. 1994).[4] As in today's case, the parties in <u>Sterling</u> entered into a contract according to which one party, Sterling, promised that it would not object to the other party, Bayer, using a certain mark so long as Bayer restricted its use of the mark in specified ways. <u>Id.</u> at 1363. Sterling later sued Bayer for breach of contract and trademark infringement. Bayer argued that the parties' agreement rendered trademark law inapplicable to the case and that contract law alone governed the parties' conduct. <u>Id.</u> at 1365, 1371 n.12. The court rejected that argument, holding that both bodies of law were applicable and basing its injunction on both. <u>Id.</u> at 1371 n.12, 1375. The <u>Sterling</u> court distinguished the <u>Affiliated</u> case on the ground that the plaintiff in <u>Affiliated</u> was pursuing an infringement action for uses that were <u>permitted</u> by the parties' agreement, which is why it was necessary for the plaintiff in <u>Affiliated</u> to

---

[4]    The court of appeals affirmed the district court's rulings on breach of contract and trademark infringement, which are the subject of the discussion in this paragraph of the text. The vacatur was limited to aspects of the district court's remedial injunction that were deemed overly broad. <u>See</u> 14 F.3d at 746, 749-50.

eliminate the contract before suing for trademark infringement. Id. at 1371 n.12.

Viewing these principles as useful guides to interpreting agreements like the one at issue here, we turn to the 1998 Agreement itself. It is a contract and it must of course be taken on its own terms, looking to the parties' intent as expressed in the contractual language. The contract is governed and interpreted in accordance with state law, here the law of Louisiana. We must decide whether the contract should be read to bar Brennan's from pursuing a trademark infringement action against Dickie. Before the advent of the 1998 Agreement, Brennan's certainly had the right to pursue such an action (which is not to say that any such action would succeed). The agreement does limit that right at least to some extent, for it provides that Brennan's "shall not object" to Dickie's use of the marks DICKIE BRENNAN'S PALACE CAFÉ and DICKIE BRENNAN'S STEAKHOUSE "so long as" Dickie arranged the words in certain ways, did not use certain typefaces, and refrained from using words (such as "original" or "famous") that would suggest a connection to Brennan's. Thus, as long as Dickie's use of the marks came within the uses described in the agreement, the contract would protect him from a charge of trademark liability. See, e.g., T&T Mfg. Co. v. A.T. Cross Co., 587 F.2d 533 (1st Cir. 1978); Rush Beverage Co. v. S. Beach Beverage Co., No. 01 C 5684, 2002 WL 31749188, at *9-11 (N.D. Ill. Dec. 6, 2002). The agreement

20

reduces the uncertainty and risk that inheres in certain uses near the outer edges of the BRENNAN'S mark by creating a safe harbor for uses that would otherwise invite colorable (though not necessarily meritorious) trademark claims. That much is agreed.

In this case, the jury found that Dickie had used the BRENNAN'S mark in ways that were not authorized under the agreement. The evidence showed that the name "Dickie Brennan" was displayed more prominently than the word "Steakhouse," for example. Thus, the question is whether the agreement bars Brennan's from pursuing a trademark case for uses outside of those contemplated and permitted in the agreement. By its terms, the language of the agreement does not preclude such a suit, for it provides only that Brennan's "shall not object . . . so long as" Dickie follows the contract's guidelines. The contract does not say that Brennan's has relinquished the right to pursue trademark remedies for uses that are not permitted by the agreement. Louisiana law provides that waivers of the right to bring future claims must be clear and are narrowly construed. See Young v. Equifax Credit Info. Servs., 294 F.3d 631, 637 (5th Cir. 2002); Brown v. Drillers, Inc., 630 So. 2d 741, 752-54 (La. 1994). The agreement accordingly cannot be taken to mean that Brennan's has implicitly given up its preexisting right to pursue trademark claims as to unauthorized uses. Put differently, the fact that Brennan's permitted Dickie to engage in certain specified uses without fear of liability does not mean that

Dickie is thereby immunized from trademark liability for all unauthorized uses.  With regard to unauthorized uses, the contract by its terms cannot be set up as a defense, and thus a trademark action is allowed.  (Of course that does not mean, as Brennan's at points suggests, that a breach of a consent-to-use agreement is per se an instance of trademark infringement.  A use might breach the contract yet not independently qualify as trademark infringement.  Cf. 2 MCCARTHY § 18:80 ("[I]n a consent agreement, the parties can bargain for a greater separation between their respective uses than would be required by general trademark and unfair competition law.").)

While the district court erred in denying Brennan's an opportunity to pursue its trademark-related claims, we note that the scope of the action that Brennan's may pursue on remand is limited in at least the following important ways.  First, since the still-in-force 1998 Agreement permits Dickie to make certain uses of his name in connection with his restaurants, Brennan's can prevail on its trademark claim only to the extent it shows that incremental confusion would likely result from Dickie's unpermitted uses.  It might be that some possibility of confusion is inherent in the operation of two nearby restaurants with similar names, but Brennan's cannot be heard to charge Dickie with being an infringer with regard to any confusion that results from uses to which it acceded in the yet-extant contract, which the district court did not terminate but instead ordered Dickie

22

to perform.[5]  See Sterling, 14 F.3d at 750; Sterling, 792 F.

Supp. at 1372 n.14.  Second, assuming that Brennan's can prove

infringement, the jury's previous finding that Dickie acted in

good faith might preclude an award of any trademark remedies that

require a showing of willfulness, see 5 MCCARTHY §§ 30:62, 30:89,

30:99, a question that we leave for the district court to address

in the first instance.  (Again, any damages would have to be

attributable to incremental confusion that stems from unpermitted

uses.)  Third, although trademark law provides more numerous and

---

[5]     For this reason, we reject Brennan's contention that
the proceedings on remand can assume trademark liability and move
directly to remedies.  The jury's findings that there was a
breach of contract and that there was a likelihood of confusion
"inconsistent with the intention" of the 1998 Agreement might not
be preclusive regarding the question whether the likelihood of
confusion arose only from unpermitted uses, a matter that we
leave to the district court to resolve on remand.

We note that our conclusions concerning the limitations on
Dickie's liability for trademark infringement reflect both the
peculiar nature of the 1998 Agreement and the fact that the
agreement remains in force.  In the usual case, a consent-to-use
agreement contemplates that there will be no marketplace
confusion as long as the consentee's uses are confined in
accordance with the contract.  See 2 MCCARTHY § 18:79.  The 1998
Agreement, however, contemplates that some confusion (though not
necessarily actionable confusion) might result even if Dickie
kept to the permitted uses, and it directed Dickie to take action
to eliminate it.  Further, in many cases the consentee's non-
compliance with the terms of an agreement would terminate the
contract and relieve the mark-holder of his contractual
obligation to allow the specified uses.  But here the jury was
instructed that they had the discretion to decide whether to
declare the contract at an end or instead to require Dickie to
specifically perform the contract.  The jury was instructed that
its decision on this question could consider the severity of
Dickie's breach, his good faith or bad faith, and the relative
fairness of the two methods of dealing with the breach.
Brennan's has not challenged this aspect of the instructions on
appeal.

23

generous remedies than contract law typically does, in this case Brennan's has already recovered $250,000 in lost profits under its contract claim. While it can pursue trademark measures of damages on remand, in no event should it be permitted to retain two payments for the same lost profits. See id. § 30:73. Because of these limitations, Brennan's might not be able to achieve any more relief against Dickie than it has already attained, despite the fact that the district court should have let it pursue an infringement case.

2. Trademark claims against Dickie's companies

The district court ruled that Dickie was permitted to use a corporate or partnership entity to exercise his rights under the 1998 Agreement. Since the district court believed that the agreement precluded a trademark action against Dickie, it likewise barred Brennan's from pursuing a trademark action against Dickie's companies, Cousins and Seven Sixteen. The plaintiffs did not assert breach-of-contract claims against the companies. As a result, the jury was not presented with any questions regarding the liability of Cousins or Seven Sixteen. The court did not issue any order requiring the companies to comply with the 1998 Agreement, though it did order Dickie to do so.

We concluded above that the 1998 Agreement does not shield Dickie from potential trademark liability for confusion that results from activities that fall outside of the contract's

24

aegis.  It follows that the agreement does not shield the companies regarding such uses either, since their rights vis-à-vis Brennan's are surely no greater than are Dickie's.  To the extent that the district court barred such claims, it erred.

There remains the question whether the companies could be sued for trademark infringement even for uses that the 1998 Agreement permits Dickie to make.[6]  Brennan's argues at points that the companies cannot avail themselves of the 1998 Agreement at all, even for uses that the agreement authorizes.  In so arguing, the plaintiffs point out that the 1998 Agreement provides that its rights are "personal" to Dickie and "may not be assigned, licensed or otherwise encumbered."  The district court rejected Brennan's position, reasoning that although the contract forbade Dickie from assigning his rights thereunder, nothing in the contract prevented him from exercising his own rights through a business entity.[7]

---

[6]     In considering this question, we do not imply that conduct consistent with the 1998 Agreement would in fact constitute trademark infringement.  The question here is not whether such a suit would succeed; rather, the question is whether a trademark suit could even be pursued in the face of the contract.

[7]     On appeal, the defendants support the district court's decision substantially on the same grounds advanced by the district court, namely that the 1998 Agreement contemplated that Dickie would be able to carry on his restaurant enterprises through business entities.  We point out that the defendants do not raise the theory, adopted by some courts but not by others, that a stranger to a consent-to-use agreement can use the agreement against the mark-holder as an admission that certain uses do not create confusion, though other courts reject such a

We agree with the district court's outcome on this score. The 1998 Agreement contemplates that Dickie has been and will be operating at least two large restaurants. While this is an activity that could be conducted as a sole proprietorship, Dickie was not then operating the restaurants as sole proprietorships, and any requirement that he do so would seriously erode the utility of the contract from his point of view. We are bound to assume, of course, that the parties intended a reasonable, practical arrangement. See, e.g., Texaco Inc. v. Vermilion Parish Sch. Bd., 152 So. 2d 541, 547-48 (La. 1963); Lamson Petrol. Co. v. Hallwood Petrol., Inc., 763 So. 2d 40, 43 (La. App. 3d Cir. 2000). That rule argues in favor of a construction according to which Dickie could continue to operate the restaurants, which were major financial undertakings, through the vehicle of his preexisting business entities. Moreover, to the extent that extrinsic evidence of the parties' intent is relevant, one of the Brennan brothers testified at trial that

---

theory. See 2 McCarthy § 18:81. In terms of the facts of this case, the argument would be that the plaintiffs' consent to let Dickie use certain names could be turned against the plaintiffs if they brought an infringement case against other parties for similar conduct, on the theory that even strangers to the consent-to-use agreement could use the plaintiffs' contract with Dickie as an admission that such uses do not produce confusion. Since the defendants have not raised this particular theory in their brief in defense of either the companies or Richard Sr., we accordingly express no opinion on whether such a theory is a viable defense in an infringement suit.

26

their concern was not whether the restaurants were run by a corporation.[8]

In sum, we conclude that the position of Dickie's companies matches that of Dickie himself: Brennan's may not pursue trademark actions against the companies for uses permitted by the 1998 Agreement, but Brennan's may pursue such actions for uses that exceed the permissions of the 1998 Agreement.

3.   Trademark claims against Richard Sr.

The district court ruled on summary judgment that Richard Sr. had breached the 1979 Agreement.  The 1979 Agreement generally forbade its signatories (of whom Richard Sr. was one) from opening or operating new restaurants in Louisiana using the Brennan name.  At the same time, however, the agreement also expressly permitted signatories to "aid" their descendants' efforts to own or to operate a restaurant "under any name."  The district court held that Richard Sr.'s minority ownership

---

[8]   In further support of its position that the companies could not claim the protections of the 1998 Agreement, Brennan's points to affidavits in which Richard Sr. and Dickie are said to have made statements inconsistent with the view that the companies could claim protection under the 1998 Agreement.  The affidavits, however, express only the view that the companies could be considered the assigns of Richard Sr.'s interests under the 1979 Agreement.  This does not affect the interpretation of the 1998 Agreement; the companies could have both statuses.

Since our conclusion rests on the parties' intent as expressed in the 1998 Agreement itself, we need not consider whether, absent such an intent, Dickie's rights could otherwise be imputed to his companies as a matter of corporations law or agency law.  Cf. Casson v. Hartford Fire Ins. Co., 548 So. 2d 66 (La. App. 3d Cir. 1989).  Nor do we consider what would happen were the relationship between Dickie and the companies to change.

27

interest in Cousins and Seven Sixteen went beyond the permitted "aid" to descendants and instead violated the 1979 Agreement. Richard Sr. has not appealed that ruling.

The district court also ruled that the 1979 Agreement barred Brennan's from suing Richard Sr. for trademark infringement, leaving Brennan's to pursue contract remedies only, which it declined to do. Brennan's appeals the district court's ruling, asking not only that we let it pursue trademark-related claims against Richard Sr. but, indeed, that we render judgment in its favor and remand for determination of an appropriate remedy.

The key section of the 1979 Agreement provides as follows:

> Each of the parties agrees that it will not assert any of its "marks" . . . against the other party with respect to said other party's use of the surname Brennan or Brennan's or the "marks," if such use is permitted by and is in accordance with this Agreement. This Agreement shall not affect the right of either party to assert at a future date, a claim, demand or cause of action, either directly or by way of counter-claim, against the other party, or its successors and assigns, that may arise . . . out of a breach of this Settlement Agreement . . . .

Under the first sentence quoted above, the plaintiffs cannot bring a trademark suit for uses that are <u>permitted</u> under the contract. By its terms, that sentence does not shield Richard Sr., since the district court found that he violated the contract's restrictions. In the second quoted sentence, each party expressly reserves the right to assert a claim that "arise[s] . . . out of a breach of" the agreement. It could be argued that a trademark suit predicated on acts that violate the

28

contract "arise[s] . . . out of" a breach of the agreement, even though such a suit sounds in tort.[9]  If so, then the second sentence of the 1979 Agreement expressly authorizes a trademark suit in a situation like the one we confront today.  But if such a trademark suit is not held to "arise . . . out of" a breach of the 1979 Agreement, then the 1979 Agreement is silent on the question of whether it bars trademark suits for future conduct that is not permitted under the agreement: The first sentence does not expressly bar such a suit, and the second sentence does not expressly reserve the right to pursue it.  As explained previously, Louisiana law requires that waivers of the right to bring future claims be clear, and such waivers are narrowly construed.  See, e.g., Young, 294 F.3d at 637; Brown, 630 So. 2d at 752-54.  Therefore, we conclude that the district court erred in ruling that the 1979 Agreement barred the plaintiffs from bringing trademark-related claims against Richard Sr.

While we agree with the plaintiffs that the 1979 Agreement does not bar their trademark-related claims against Richard Sr., we cannot accede to their request that we simply render judgment against Richard Sr. on trademark infringement.  That he breached

---

[9]      In a recent decision involving an insurance policy that excluded coverage for injuries "arising out of . . . [b]reach of contract," this court held under Texas law that a trademark infringement action related to a violation of a licensing arrangement "aris[es] out of" a breach of contract.  See Sport Supply Group, Inc. v. Columbia Cas. Co., 335 F.3d 453, 458-59 (5th Cir. 2003).

the 1979 Agreement--a ruling he did not appeal--does not by itself mean that he infringed the plaintiffs' trademarks through his conduct with regard to Dickie's restaurants. Among other things, it is unclear whether Richard Sr.'s level of participation in the restaurants is sufficient to expose him to personal liability. See generally Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477-78 (11th Cir. 1991); 4 MCCARTHY § 25:24. The district court must consider any such defenses on remand.

D.    Reasonable royalty as a measure of damages

The district court barred the plaintiffs from presenting evidence of a reasonable royalty in the damages phase of the case. The amount that a party hypothetically would have agreed to pay as a reasonable royalty for use of the mark is sometimes used as a measure of damages in trademark actions, especially those involving licensing relationships. See 5 MCCARTHY § 30:85. But it is much less familiar as a measure of contract damages, which is the type of claim that went to the jury. During the charge conference for the damages phase of the trial, Brennan's took the position that lost profits and a reasonable royalty were alternative methods of quantifying the loss attributable to Dickie's breach of the 1998 Agreement. On appeal, it takes the position that, in order to receive a full recovery for the defendants' breach of contract, it is entitled to both types of damages. In support, it relies principally on the codal

30

provision stating that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." LA. CIV. CODE ANN. art. 1995 (West 1987) (emphasis added).

The basic rule of contract remedies is that the plaintiff is to be put in the same position he would have occupied had the defendant performed his obligation. Morris v. Homco Int'l, Inc., 853 F.2d 337, 346 (5th Cir. 1988) (applying Louisiana law); Amoco Prod. Co. v. Texaco, Inc., 838 So. 2d 821, 837 (La. App. 3d Cir. 2003). A plaintiff is not entitled to be put in a better position by recovering twice for the same harm. Morris, 853 F.2d at 346; Town of Winnsboro v. Barnard & Burk, Inc., 294 So. 2d 867, 882 (La. App. 2d Cir. 1974).

Even if a reasonable royalty could be a proper measure of contract damages under Louisiana law--a proposition on which we express no opinion--we must reject the plaintiffs' argument. In the circumstances of this case, it is evident that the two proposed measures of damages do not aim to compensate Brennan's for discrete, independent harms. The plaintiffs' expert's report calculated several different measures of damages, and it is important to understand the relationships between them. The expert calculated the plaintiffs' lost profits by estimating the number of customers that Brennan's lost during the period of time, which stretched back several years before trial, in which

31

Dickie's restaurants were allegedly causing confusion.[10] The hypothetical royalty set forth in another part of the report was simply calculated as a percentage of the defendants' sales during that same time period. Thus, the lost-profits calculation aims to put Brennan's in the position it would have occupied but for the breach by estimating what Brennan's would have earned had Dickie's restaurants not caused confusion in the marketplace. The royalty calculation, in contrast, aims to make Brennan's whole through the more indirect method of capturing what Brennan's hypothetically would have received from Dickie in exchange for licensing Dickie to use the BRENNAN'S mark in an otherwise infringing (i.e. confusing) manner. But Brennan's would be made doubly whole were it to receive the profits it would have made in the absence of confusion plus the royalties it would have demanded to permit that same confusion. That Brennan's may not do.

Taking a different tack, Brennan's has also argued that a reasonable royalty is a permissible proxy for lost goodwill and that it is entitled to recover lost goodwill as an element of contract damages under Louisiana law. But the reasonable royalty calculated by its expert does not capture a loss of goodwill in the sense of damage to a business's reputation going forward, nor in the accounting sense of the value of a business apart from its

_____

[10]    The plaintiffs' expert's methodology is described in more detail in Part III.A infra.

32

value as a mere collection of assets.  See Simpson v. Restructure Petrol. Mktg. Servs., 830 So. 2d 480, 486 (La. App. 2d Cir. 2002); Kenneth M. Kolaski & Mark Kuga, Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?, 18 J.L. & COM. 1, 15-16 (1998) (both explaining the concept of goodwill).  In fact, the expert's royalty calculation--which was computed as a percentage of Dickie's restaurants' sales during the period of confusion--simply provided another metric for recompensing the damage that the plaintiffs suffered during the same time period used in the expert's lost-profits calculation.  But cf. Simpson, 830 So. 2d at 486 (explaining that a breach of contract could be remedied by an award of past lost profits plus an award for a loss of business reputation, which would address future sales).  We therefore reject Brennan's request to supplement its lost-profits recovery on its breach-of-contract claim with a royalty award.

### III. CROSS-APPEAL ISSUE

On cross-appeal, Dickie and Dickie Brennan & Co. challenge the testimony of the plaintiffs' damages expert.  They argue that the testimony should have been excluded for several reasons and that, without it, the jury's $250,000 verdict cannot stand.

A.    Relevant facts

In the damages phase of the trial, Brennan's relied on expert testimony from William Legier.  Legier attempted to

33

quantify the plaintiffs' lost profits through a "but for" method;
that is, he attempted to determine how many customers Brennan's
would have served (and how much profit would have been generated
thereby) but for the confusion caused by Dickie's restaurants.
To determine how many customers Brennan's lost, Legier calculated
Brennan's customer counts as a percentage of the attendance at
the New Orleans convention center. (Brennan's relies heavily on
out-of-town visitors.) The method yielded three different lost-
profits figures--a low figure, a high figure, and a weighted
average figure--each representing a different set of assumptions
regarding Brennan's historical market share. If Brennan's
Restaurant's business decreased in relation to convention traffic
in the years following the opening of Dickie's restaurants, the
decline could be attributed to consumer confusion.

In his initial report, provided to the defense on July 8,
2002, Legier relied on convention attendance raw data provided by
the convention center's marketing department. The defendants'
expert, Douglas Tymkiw, issued his report on August 5. At that
time, Tymkiw did not have access to the work papers and
calculations that supported Legier's estimates, but Tymkiw did
note that Legier's conclusions appeared inconsistent with the
convention attendance data that Tymkiw had obtained. On
September 12, after reviewing Legier's work papers and
deposition, Tymkiw issued a supplemental report in which he
concluded that Legier had used faulty convention attendance data.

34

Brennan's filed a motion to exclude Tymkiw's supplemental report and related testimony, but the district court decided on October 21 that the report was for the most part admissible. On October 23, a bit less than a week before trial, Legier then provided his own supplemental report in which he used the adjusted attendance data that Tymkiw said were correct.[11]

The defendants quickly filed a motion in limine seeking to exclude Legier's supplemental report. They charged, among other things, that the supplemental report was simply an over-late effort to correct Legier's initial errors and that the defendants would be prejudiced in their trial preparation, particularly since they had not yet been provided with the work papers that supported the supplemental report. The district court denied the

---

[11] The defendants' brief contends that Legier contradicted himself regarding when he came into possession of the adjusted data. Like the district court, we have examined Legier's testimony, his reports, and a post-trial affidavit submitted in response to the defendants' Rule 59(e) motion. The district court reasonably concluded that there did not appear to have been any duplicity. Legier had in his possession at the time of his initial report a faxed one-page summary of adjusted attendance totals, but he instead used the marketing department's detailed raw data, which could be analyzed and checked for accuracy more readily than the end totals on the summary. After filing his initial report, he learned that the convention center's chief financial officer maintained an adjusted set of the detailed raw attendance figures that Legier had used in his initial report. This adjusted set of detailed data is not the same thing as the one-page summary that Legier had in his possession all along, though the former was apparently the source for the latter. Legier's statements that he did not have the adjusted data at the time of his initial report is, therefore, not inconsistent with the fact that he was in possession of the summary at the time of the initial report.

35

motion, based in part on its belief that the defense had in fact been given the supplemental work papers.

Legier testified on November 7.  His testimony referred to a lost-profits figure that differed somewhat from the one set forth in his supplemental report; the difference was attributable to an adjustment to account for the fact that the jury's verdict, rendered earlier that day, had found Dickie in breach only with regard to his Steakhouse restaurant, not the Palace Café.[12] Tymkiw took the stand the next day and, during cross-examination, mentioned that he had not received the work papers supporting Legier's supplemental report.  The judge, quite taken aback by this revelation, then excused the jury and conferred with the attorneys.  The judge said that she thought that the plaintiffs had represented that the papers had been turned over and that she would have granted the defendants' motion in limine had she known otherwise.  Counsel for Brennan's stated that he thought that the supplemental work papers had been provided, but opposing counsel told the judge he had never received them.  The defendants reurged their motion in limine.  The district court, recognizing that they were now in "a heck of a mess," gave Tymkiw a chance to review the papers briefly to see if there was anything that he

---

[12]     Dickie Brennan's Palace Café predated Dickie Brennan's Steakhouse.  With the Palace Café out of the case, the period of consumer confusion stretched back only to the opening of the Steakhouse at the end of 1998.  Legier therefore eliminated the lost profits that occurred before the Steakhouse opened.

needed to examine further.  There were several pages of calculations, but the bulk of the 77-page packet consisted of the adjusted convention attendance data.  The judge then gave Tymkiw an hour in which to look at the papers and discuss them with the defendants' attorneys.  At the conclusion of the recess, the parties' argued the motion in limine again.  The judge stated that she was going to "stick [her] neck way out" and not exclude Legier's testimony, directing the parties to take up the matter in post-trial motions.

After the verdict, the defendants pressed the issue of Legier's testimony once more in a written motion to alter or to amend the judgment under Rule 59(e).  The district court denied the motion, concluding that the defendants had not been prejudiced by the late disclosures.  On appeal, the defendants continue to contend that the district court erred in admitting the testimony.  They further argue that without Legier's testimony, there is insufficient evidence on which the jury could have rendered its $250,000 verdict.

B.  Analysis

The defendants raise three related objections to Legier's testimony: (1) that it was unreliable and should have been excluded under Federal Rule of Evidence 702 and Daubert, (2) that Legier's supplemental report was not actually "supplemental" within the meaning of Federal Rule of Civil Procedure 26(e), and (3) that the testimony should have been excluded under Federal

37

Rule of Civil Procedure 37(c)(1) because the plaintiffs failed to disclose the work papers that supported the supplemental report.

Turning first to the Rule 702/<u>Daubert</u> issue, the defendants contend that Legier's testimony was unacceptably unreliable because the ultimate conclusions in his supplemental report showed a lost profit of approximately half the size set forth in the initial report. This type of variance is indeed a cause for pause, but the reason for the difference was that Legier's supplemental report applied the same methodology used in the initial report to a different, more accurate set of data (i.e., the CFO figures) that the defendants' own expert said should be used. The defendants' brief does not offer argument on whether Legier's methodology was improper. It is true, of course, that the methodology must also be applied reliably to reliable data, <u>see</u> FED. R. EVID. 702, but the important point on that score is that the adjusted figures that formed the basis for Legier's actual testimony were the same data that formed the basis for Tymkiw's report. We therefore conclude that the district court did not abuse its discretion in deeming Legier's expert testimony sufficiently reliable. To the extent that there was a problem with what happened during the damages phase of the trial, we must look elsewhere.

The defendants' other arguments concerning Legier's testimony focus not on the reliability of the testimony itself but on the unusual course of events that led up to the testimony.

38

First, with regard to Rule 26(e), the defendants' argument is that Legier's second report was not truly a "supplemental" disclosure because the CFO's adjusted attendance figures were in Legier's possession even before he filed his initial report.[13] As the defendants present it, their argument subtly misconstrues the office of Rule 26(e). Rule 26(e) imposes "a duty to supplement or correct [a] disclosure or response to include information thereafter acquired" (emphasis added). The rule is properly invoked to bar evidence when a party fails to make a required supplemental disclosure. E.g., Alldread v. City of Grenada, 988 F.2d 1425, 1435-36 (5th Cir. 1993). If, as the defendants say, the subsequent report was not really "supplemental" but instead effectively replaced the earlier report, the duty to supplement would not by itself provide a reason to exclude Legier's testimony--though there might well be other grounds to exclude it, such as that the plaintiffs' disclosures were untimely or otherwise violated Rule 26(a) or the court's scheduling order. Cf. Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 571 (5th Cir. 1996) (upholding district court's exclusion of expert testimony where initial

---

[13]    As pointed out earlier, Legier had the summary of adjusted attendance totals but does not appear to have had the adjusted raw data at the time of the initial report. The adjusted data set certainly existed at the time of the initial report, and indeed Tymkiw obtained it. But it is uncontradicted that Legier thought at the time of his initial report that the raw data from the marketing department represented a complete and best-available source of information.

expert reports were mere outlines, though the reports were "supplemented" after the disclosure deadline).

The defendants frame their grievance against Legier's testimony most persuasively when they contend that Legier's supplemental report and testimony relating thereto should have been excluded because Brennan's did not timely turn over the supporting work papers and calculations. Under Rule 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed." We can assume that Brennan's failed in its disclosure obligations regarding the supplemental work papers. The decision whether the failure was justified and/or harmless is committed to the district court's sound discretion, which we review for abuse. Texas A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 402 (5th Cir. 2003); United States v. $9,041,598.68, 163 F.3d 238, 251-53 (5th Cir. 1998).

The district judge found herself in an extremely difficult position after the revelation that Tymkiw had not seen the supplemental work papers. She could have properly exercised her discretion by excluding Legier's testimony. She was understandably reluctant to do that, given that the case had already gone on for over a week, the jury had rendered a verdict on liability, and Legier was the only witness in the damages

40

phase.  To all appearances, counsel for Brennan's honestly thought that the papers had been turned over, although they could not present any evidence of delivery.  In the circumstances of this case, we cannot conclude that the district judge abused her discretion in her response to this predicament.  Our decision is driven largely by the reasonableness of the district court's assessment that the defendants were not prejudiced by the tardy receipt of the documents.

As noted above, the supplemental work papers consisted largely of attendance data from the convention center--data with which Tymkiw was already familiar since he had used it in his own report.  The district court could well decide that the late delivery of this information was quite harmless.  Cf. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999) (upholding the district court's decision not to prevent the plaintiff from presenting evidence on a previously undisclosed theory of damages where, inter alia, the defendant knew the numbers on which the calculations were based).  Potentially of greater consequence were the relatively few pages showing Legier's calculations, but here too the record bears out the district court's assessment that the defendants were not prejudiced.  Legier's methodology had not changed, doubtless easing any difficulty in understanding the calculations.  After reviewing the work papers during the recess, Tymkiw testified on redirect examination that the calculations showed that in certain

years, using the lowest of Legier's three figures, Brennan's Restaurant suffered no lost profits. Tymkiw also used the work papers to explain to the jury an aberration in Legier's 1999 results that Tymkiw had remarked upon in earlier testimony but had been unable to explain, repairing any deficiency in his earlier ability to scrutinize that aspect of Legier's report. The defendants were given latitude to inform the jury of the unusual circumstances surrounding Legier's report. Tymkiw's testimony, both before and after the recess, appears from the transcript to have been extremely powerful. In its closing arguments, Brennan's cited $2.2 million as the lost-profits figure supported by Legier's work. The jury, which had also heard testimony during the liability phase of the trial that some customers actually did mistake Dickie's restaurants for Brennan's Restaurant,[14] awarded $250,000 in compensation for breach of the 1998 Agreement. Significantly, neither in its post-trial motion to amend the judgment nor in its brief here have the defendants set forth any additional revelations from the work papers that they would have, if given more time, unearthed and presented to

---

[14] The plaintiffs' closing argument gave roughly equal emphasis to Legier's expert testimony and to the testimony of actual confusion related during the liability phase. Counsel reminded the jury of anecdotal evidence from restaurant employees and customers, a survey performed by the defendants that showed that a small percentage of customers confused the restaurants, and expert testimony that customers who actually realize that they have confused the restaurants represent only "the tip of the iceberg."

the jury.  The district judge was forced to deal with a very difficult situation that arose on the last day of trial, and we find no abuse of discretion in her response to it.  Therefore, while we recognize that what happened during the damages phase of this case was irregular, we do not believe reversal is required.

### IV. CONCLUSION

We AFFIRM the district court's judgment insofar as it awarded $250,000 in damages, plus interests and costs, to Brennan's on its breach-of-contract claim, and we AFFIRM the district court's denial of the plaintiffs' motions for judgment as a matter of law or for a new trial on their fraudulent inducement claim.  We REVERSE the district court's rulings that the 1998 Agreement bars the plaintiffs from pursuing trademark-related causes of action against Dickie, Cousins, and Seven Sixteen.  We REVERSE the district court's ruling that the 1979 Agreement bars the plaintiffs from pursuing trademark-related causes of action against Richard Sr.  The case is REMANDED for further proceedings consistent herewith.  Each party shall bear its own costs.